**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | )**No. CR00-186TSZ** |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )**Seattle, Washington** |
| | )**1:30 p.m.** |
| **NORMAN HUGH SMITH,** | )**July 14, 2005** |
| | ) |
| Defendant. | ) |

_____ )

VERBATIM REPORTED PROCEEDINGS FOR:
**EVIDENTIARY HEARING**

BEFORE THE HONORABLE **MARY ALICE THEILER**

UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES:

For the Plaintiff:      **ILENE MILLER, ESQ.**
                        Assistant United States Attorney
                        1201 Pacific Avenue, Suite 700
                        Tacoma, Washington 98402


For the Defendant:      **TERRENCE KELLOGG, ESQ.**
                        720 Third Avenue, Suite 1900
                        Seattle, Washington 98104-1897



Court Reporter:         **DONNA HUNTER, RPR**
                        #801 Washington Building
                        1019 Pacific Avenue
                        Tacoma, Washington 98402
                        (253) 627-2062

| | EXHIBITS | | | |
|---|---|---|---|---|
| Ex. No. | | Offered | Admitted | Denied |
| Government's No. 1 | | 16 | 16 | |
| Government's No. 33 | | 25 | 27 (only page one) | |
| Government's No. 2A | | 48 | 48 | |
| Government's No. 2B | | 48 | 48 | |
| Government's No. 3 | | 54 | 54 | |
| Government's No. 2 | | 54 | 54 | |
| Government's No. 29 | | 56 | 56 | |
| Government's No. 9 | | 57 | 57 | |
| Government's No. 4 | | 58 | 58 | |
| Government's No. 4A | | 58 | 58 | |
| Government's No. 4B | | 58 | 58 | |
| Government's No. 7A | | 61 | 62 | |
| Government's No. 7B | | 61 | 62 | |
| Government's No. 7C | | 63 | 63 | |
| Government's No. 8D | | 65 | 66 | |
| Government's No. 8A | | 68 | 68 | |
| Government's No. 8B | | 68 | 68 | |
| Government's No. 8C | | 68 | 68 | |
| Government's No. 8E | | 68 | 68 | |
| Government's No. 11B | | 73 | 73 | |
| Government's No. 11C | | 73 | 73 | |
| Government's No. 11A | | 73 | 74 | |
| Government's No. 10 | | 74 | 74 | |
| Government's No. 5A | | 75 | 75 | |
| Government's No. 5B | | 75 | 75 | |
| Government's No. 5C | | 75 | 75 | |
| Government's No. 12N | | 77,79 | 80 | |
| Government's No. 12O | | 80 | 81 | |
| Government's No. 12A | | 82 | 82 | |
| Government's No. 12B | | 83 | 83 | |
| Government's No. 12C | | 84 | 84 | |
| Government's No. 12D | | 85 | 85 | |
| Government's No. 12DD | | 85 | 85 | |
| Government's No. 12E | | 86 | 86 | |
| Government's No. 12F | | 87 | 88 | |
| Government's No. 12G | | 87 | 88 | |
| Government's No. 12H | | 89 | 89 | |
| Government's No. 12I | | 92,94 | 94 | |
| Government's No. 12J | | 94 | 94 | |
| Government's No. 12K | | 95 | 95 | |
| Government's No. 12L | | 96 | 96 | |
| Government's No. 12M | | 96 | 96 | |
| Government's No. 28 | | 102 | 103 | |
| Government's No. 31 | | 103 | 104 | |
| Government's No. 32 | | 104 | 105 | |
| Government's No. 34 | | 106 | 106 | |

1                            **INDEX**

2    preliminary matters 03-05

3    opening statement by Ms. Miller 05-06

4    opening statement by Mr. Kellogg 06-12

5

6

7

8

9

10   **Witness**            **Direct**     **Cross**      **Redirect**    **Recross**

11

12   Gina Martinis        13-26      26-36      36-40      40-42

13   Calvin Bouma         42-106

14

15

16

17

18

19

20

21

22

23

24

25

1    (Defendant present.)

2              THE CLERK:  All rise.  United States District Court

3    is again in session, the Honorable Mary Alice Theiler

4    presiding.

5              THE COURT:  Good afternoon.  Please be seated.  This

6    is a new courtroom for me.  I've never sat in this one before,

7    so it's a new experience.  This is Case No. 00-186, United

8    States v. Norman Hugh Smith, and we continued this from last

9    month I think it was, yes, 6-14 so as to give us more time to

10   consider the issues in the petition.

11             I did address several issues at the last hearing,

12   and I think I issued an order to that effect, and I'm assuming

13   everything has been taken care of, but if there is something

14   regarding the order I issued last month that needs to be taken

15   up, someone should let me know at this point.  Mr. Kellogg,

16   anything that I need to address?  And be mindful, weird thing

17   about this courtroom we don't have microphones at counsel

18   table, so whatever you say won't be recorded.

19             MR. KELLOGG:  Your Honor, I think we are in fine

20   shape for the hearing.  There might be a little detail over a

21   piece of property, but that can be taken up later.

22             THE COURT:  All right.  Do you agree, Ms. Miller?

23             MS. MILLER:  Yes, Your Honor, we submitted the bill

24   of particulars as the Court ordered us to to do so, and we've

25   also submitted an exhibit list and witness list, however, we

1  have a revised exhibit list which should be here momentarily.

2  There were I believe four new exhibits added that is being

3  added to your notebook and that I've previously provided to

4  Mr. Kellogg prior to this hearing.

5          THE COURT:  Okay.  Well, Ms. Miller, maybe you could

6  indicate, and at this point why don't you come to the podium,

7  how you would like to proceed so I have an idea of what is

8  going to happen.

9          MS. MILLER:  Your Honor, I think that the best way

10  to proceed, the government has two witnesses.  We had Gina

11  Martinis who was the Defendant's original probation officer,

12  and then we have Calvin Bouma who is the Defendant's probation

13  officer now and he took over after Gina Martinis, and they

14  will be witnesses for the government in this case, and so, we

15  hope to present those two witnesses, and that should be it.

16          THE COURT:  Okay.  Great.  Thank you.  And, Mr.

17  Kellogg, what do you intend to do by way of presentation this

18  afternoon?

19          MR. KELLOGG:  Your Honor, we also have two

20  witnesses, Alice Smith and the supervised releasee, Hugh

21  Smith, the defendant.  I think that in my discussions with Ms.

22  Miller we've agreed that approximately up to an hour each

23  side, depending how it goes, but we see being able to conclude

24  testimony this afternoon.

25          THE COURT:  And I cannot -- unfortunately I cannot

1    go past 4:00 o'clock today, but if we do what you just said,

2    that should be fine.  You listed a Norman Short as a witness,

3    are you not calling him?

4              MR. KELLOGG:  I will not be calling Mr. Short

5    because that was with reference to the allegation that has

6    been dismissed by the government, the one of not entering into

7    an agreement with IRS.  That was dismissed at our last

8    hearing.

9              THE COURT:  Okay.  Great.

10              MR. KELLOGG:  As well as my first two proposed

11    exhibits went to that as well, A-1 and A-2, and I would ask to

12    be able to give a brief opening statement when we get

13    underway.

14              THE COURT:  Sure.  Would you like to do that at the

15    beginning of the presentation of your case or would you like

16    to do that right at the beginning?

17              MR. KELLOGG:  At the beginning.

18              THE COURT:  Ms. Miller, did you want to do that

19    first, or did you plan to present an opening statement?

20              MS. MILLER:  Your Honor, I could just make a few --

21              THE COURT:  Why don't you do that.  It will help me

22    as well.

23              MS. MILLER:   I would like to give you a brief

24    overview of this case.  Your Honor, this case essentially

25    stems from December 1st, 2003 through September 2004 and

1    arises from the Defendant's attempts to hide assets by

2    falsifying financial reports and monthly reports.  This

3    conduct is nothing new for the Defendant.  His conduct was the

4    basis for his underlying case and the hefty sentence that the

5    Judge Zilly gave the Defendant.  This conduct permeates

6    everything in the Defendant's life.

7            In this underlying case, he recorded assets to

8    Pretrial Services that miraculously disappeared.  We're not

9    talking about small amounts of money either, but hundreds and

10   hundreds of thousands of dollars.  Gina Martinis will tell you

11   that that is why the Defendant's condition of probation were

12   super specific and particular to this defendant.  And in order

13   to prove these allegations, the government will show that the

14   Defendant had and still has an affiliation with his company,

15   Offshore Adventures and the boat, FD ALLIANCE.

16           The government will also offer evidence that shows

17   that reports in statements that the Defendant submitted to the

18   Probation Office are riddled with lies and falsities

19   throughout.

20           THE COURT:  Mr. Kellogg, let's hear from you then.

21           MR. KELLOGG:  Well, Your Honor, I have represented

22   Mr. Smith at the underlying case and I'm somewhat taken aback

23   and at a disadvantage that the government wants to retry

24   allegations that were part of his original sentencing as far

25   as secreting of assets or hiding of assets.  That is not my

1    understanding from what happened at the time that Judge Zilly

2    originally pronounced sentence, and certainly not part of the

3    allegations that we're to address today.

4            There is no showing, nor can the government make a

5    showing that at any time did Mr. Smith hide assets, I submit,

6    prior to his sentencing, which again, is not at issue, but

7    more importantly during the term of supervised release.  There

8    -- the government is not going to be able to establish by

9    preponderance of the evidence that Mr. Smith had substantial

10   assets that he had access to, that he riddled his reports with

11   lies and falsehoods about.  This is a real simple case.  What

12   happened here is that Mr. Smith at one time was a very

13   successful entrepreneur.  He and his former wife, Alice Smith,

14   owned a company in central Washington called PLP, a plastics

15   company that they sold in 1996, well before there were any

16   applications of wrongdoing.  Mr. Smith set up the Smith

17   family trust.  Assets were transferred into that trust at its

18   inception in 1996.

19           Mr. Smith did enjoy some moderate -- well, actually

20   he was a fairly wealthy individual prior to the government

21   having indicted him.  He retained private counsel for both

22   himself and his wife, and he expended tremendous cash

23   resources in that endeavor leaving him virtually broke.  When

24   he came out of prison, he was more than financially broke,

25   Your Honor, he was a broken man, serious health problems.  Mr.

1    Smith is in his early 60s, but he suffers from some physical

2    problems.  He is doing a little bit better after his period of

3    imprisonment, and he had lost everything.  He was virtually

4    afraid to do anything.

5           His former wife, Alice Smith, provided him with a

6    place to live.  He reported that to Ms. Martinis.  He was

7    virtually housebound, afraid to do anything for fear of doing

8    the wrong thing.  Eventually he started to take some classes

9    through the community college and studying things like

10   chemistry and finance, and he has done well with that and

11   hopes to be able to continue with that, but the specific

12   allegations as we understand them to be from the initial

13   violation report, and more likely more specifically in

14   answering the bill of particulars concerns some of these

15   trappings from things that were in place and in existence

16   prior to his sentence of imprisonment back in year 2000.

17          And I am going to go through three or four of those,

18   because I think it will help the Court understand the evidence

19   as it comes out.  There is a bank account at Viking Bank for

20   the Offshore Adventures which is the corporate entity that

21   owns the fishing vessel, ALLIANCE.  Mr. Smith is not a

22   shareholder or a stockholder in Offshore Adventures.  He is

23   not an officer or a director of Offshore Adventures.  His

24   wife, Alice Smith, is president of Offshore Adventures, and

25   the Smith family trust owns all of the stock in Offshore

1   Adventures.  But Mr. Smith had signatory powers over the

2   Viking Bank account, checking account, and the Court is going

3   to see several checks, checks that they submit were signed by

4   either Alice Smith or Hugh Smith that were such that he should

5   have disclosed the Viking Offshore Adventures account as an

6   asset of his.

7          Well, the defense's position is simply because he

8   could sign on that and simply because some checks were written

9   for his benefit as specifically authorized and directed by

10  Alice Smith, and you will hear from Ms. Smith in that regard,

11  it did not make it an asset of his, and he is not in violation

12  of having answered the questions on the monthly reports not

13  taking into account that -- that checking account.

14  Specifically the fishing vessel needed some repairs.  There

15  were some checks signed by Mr. Smith for parts and repairs for

16  the boat, and Alice Smith wanted Mr. Smith to be able to

17  reintegrate into society by pursuing the schooling that he was

18  going to, and there were some checks that were written to pay

19  for his schooling expenses.  There were some checks written to

20  pay for an insurance policy, and those checks are IMG.

21          That insurance policy, we believe the government may

22  again contend was part of the falsehoods in the monthly

23  reports and cash flow statements that Mr. Smith entered,

24  because only on occasion did he reference the IMG account.

25  That account going back to a Small Business Administration

1   loan for the plastics company in the early '90s was a

2   requirement of the Small Business Administration.  The

3   insurance account is actually owned by the Smith family trust.

4   The beneficiary is Alice Smith, and we submit that Hugh Smith

5   was not obligated to report the existence of that account, nor

6   were payments from the Viking Bank account for that insurance

7   policy any wrongdoing on the part of Mr. Smith, including his

8   not accounting for those on the monthly reports.

9           The second yet related area, as we've already heard

10  in the State's opening -- the government's opening is

11  ownership of the fishing vessel, ALLIANCE.  And they use the

12  term not ownership but affiliation.  Well, we submit that

13  there is within the umbrella term affiliation an ongoing

14  relationship between Mr. Smith and the fishing vessel,

15  ALLIANCE, but he does not have an ownership interest in that

16  -- in that boat.  It's owned by Offshore Adventures, the stock

17  of which is owned by the Smith family trust.

18          The evidence will be that during the spring of 2004

19  Hugh Smith did through emails and once inadvertently in a

20  Coast Guard application represented himself to be president of

21  Offshore Adventures.  That was not true.  The reason he did

22  that with the emails going to American Samoa and Pago Pago, or

23  wherever the boat was, was because he was dealing with people

24  that would not accept the authority of his wife as president,

25  and he was trying to bring about a resolution of a crisis with

1   the theft of the boat, conversion of fish, conversion of

2   supplies on the boat.  But the testimony will establish that

3   Alice Smith was, in fact, running the fishing vessel ALLIANCE

4   as owner.  While she would delegate specific tasks to Mr.

5   Smith from time to time as far as necessary repairs or

6   supplies, she was the one who made the ultimate business

7   decisions with the boat throughout 2004 and throughout this

8   year.

9          There is another separate area of concern, and that

10  deals with the American Century check, and that's

11  C-E-N-T-U-R-Y in excess of $5,000 which was seized by the

12  government upon the September 2004 search of the Smith

13  residence.  That was a check which Mr. Smith did not disclose

14  on his financials because he was simply not cognizant of it

15  having forgotten about it.  It was a gift trust, and we will

16  present evidence as to the significance of that particular

17  structured investment that by its terms was not refundable,

18  nor did it have a cash value until September until its

19  maturity, which was September of 2004.

20         Alice Smith, pursuant to the power of attorney which

21  she'd enjoyed since Mr. Smith was sentenced to prison in 2000,

22  signed Hugh Smith on the authorization request for

23  disbursement upon notification of the maturity of the American

24  Century check did not even discuss it with Hugh Smith.  He was

25  not aware of it and that is why he did not report it.  Then we

1   have what I refer to as miscellaneous little items, the bill

2   of particulars submitted by the Court -- submitted by the

3   government, again, but for some of their claims of -- of

4   falsity in the reports, and some of those were a $230 check

5   from a McKittrick, (phonetic) a woman in Oregon that Mr. Smith

6   enjoys an emotional relationship with.  The check was payable

7   to him.  It had been sitting around for several months.  The

8   Court will hear why that was not an asset.

9          There is an allegation that in monthly reports filed

10  during the months of 2004 Hugh Smith did not disclose a post

11  office box.  Well, in fact, it was a private mailbox that had

12  been set up prior to his term of imprisonment, and again, the

13  Court will hear from Mr. Smith why he felt from the question

14  that was asked on the form that he was not obligated to report

15  private mailbox, since it was not, in fact, a post office, a

16  United States post office box.  And there will be similar

17  responses to allegations of falsity as to cash flow

18  statements, so hopefully that will give the Court a better

19  appreciation of the evidence as it comes in.

20          THE COURT:  Okay.  Thank you very much.  All right.

21  Ms. Miller?

22          MS. MILLER:  Your Honor, first I do have the

23  revised exhibit list if the Court would like me to hand that

24  up?

25          THE COURT:  Yes, thank you.

1          MS. MILLER:   Your Honor, the government calls Gina

2    Martinis.

3          MR. KELLOGG:  Your Honor, for the record, I will be

4    moving to exclude witnesses.  I assume that does not apply to

5    Mr. Bouma and Ms. Martinis.  We have excluded Alice Smith from

6    the hearing anticipating the government asking for that.

7          THE COURT:  Right.  Thank you.  I assume that's why

8    she was waiting outside.

9          **GINA MARTINEZ**, after having been duly sworn in by

10   the Court testified as follows:

11         THE CLERK:  Please have a seat.

12         THE COURT:  Please state your full name.

13         THE WITNESS:  My name is Gina Martinis.  For the

14   record that is M-A-R-T-I-N-I-S.

15         THE COURT:  Ms. Miller?

16                   **DIRECT EXAMINATION**

17   BY MS. MILLER:

18       Q.   Thank you, Your Honor.  Ms. Martinis, how long have

19   you been a probation officer?

20       A.   For the federal government approximately six and a

21   half years.

22       Q.   And were you Norman Hugh Smith's original probation

23   officer?

24       A.   Yes, I was.

25       Q.   And how long did you supervise him?

1     A.   I believe he was released from custody in November

2   of zero --

3     Q.   2003?

4     A.   2003, and then I supervised until September of '04.

5     Q.   And you first met with him on November 18, 2003?

6     A.   That's correct.

7     Q.   At that time did you go over his conditions of

8   supervised release?

9     A.   Yes, I did.

10    Q.   Would you please explain to the Court how you did

11  that.

12    A.   When Mr. Smith arrived to the Probation Office in

13  Everett, we went into my office and reviewed the probation

14  form 7A I believe that outlines all of the conditions that

15  were imposed at the time of his sentencing.  We reviewed them

16  in detail, each one individually and discussed them if he any

17  questions or concerns.

18    Q.   And if you could please turn to government's Exhibit

19  No. 1.

20    A.   Okay.

21    Q.   Are those the conditions that you went over with the

22  Defendant?

23    A.   Yes, they are.

24    Q.   And did he sign these conditions acknowledging the

25  conditions that were set into place?

1      A.    Yes, he did.

2      Q.    And did you sign that as well?

3      A.    Yes, I did.

4            MS. MILLER:  Your Honor, I would move to admit

5   Government's No. 1.

6            THE COURT:  Mr. Kellogg?

7            MR. KELLOGG:  No objection, Your Honor.

8            THE COURT:  Exhibit 1 is admitted.

9      Q.    Thank you.  When you went over the conditions with

10  the Defendant, did he have any questions?

11     A.    He did.  He had lots of questions and comments

12  regarding all of the special conditions ordered by the Court.

13     Q.    Specifically what questions did he have?

14     A.    To the best of my recollection, he had questions why

15  they were imposed and why they -- they needed to be followed

16  and he was somewhat --

17           MR. KELLOGG:  Objection, further response is not

18  responsive.

19           THE COURT:  Sustained.

20     Q.    What other types of questions did he have for you?

21     A.    With regard to the special conditions?

22     Q.    With regard to the special conditions.

23     A.    Specifically I can't remember specific questions.

24     Q.    To the best of your recollection then.

25     A.    Basically I recall he did not understand or did not

1    want to sign the credit or the authorization to conduct credit

2    checks, so that was something we discussed at length.  And

3    after a long discussion, he ultimately did sign that, and we

4    did proceed to run a credit check.  Looking through here we

5    discussed the last condition with regard to cooperating with

6    the IRS at length, and he had indicated that he had already

7    cooperated and provided me with -- said he would provide me

8    with the name and contact information of the individual he was

9    working with.

10       Q.   Did the Defendant also question the necessity of

11   some of those conditions?

12       A.   Yes, he did.

13       Q.   And what was your response to that?

14       A.   Well, just as I would respond to any questions of

15   that nature, that was imposed by the Court, it was the Court's

16   wishes at the time of sentencing, and he would be -- he would

17   held responsible to comply with those conditions, unless he

18   wanted to go back to Court to have them amended.

19       Q.   After you fully explained the conditions to the

20   Defendant, was he satisfied -- were you satisfied that he

21   understood those conditions?

22           MR. KELLOGG:  I'm going object to the relevancy and

23   speculation on the part of the witness.  It's not relevant

24   what she thought he was thinking.

25           THE COURT:  I'll allow it.  I think she is in a

1   position to evaluate it, that she would need to evaluate it,

2   so go ahead.

3           THE WITNESS:  Yes, I definitely think he was -- he

4   understood all the conditions, and it is one of the clauses on

5   the end of the probation form 7A that before you sign, it says

6   that he has -- he fully understands those conditions.

7       Q.   Now, can you please tell the Court about some of

8   those special conditions.  Were some of these conditions

9   unusual?

10      A.   They were from my experience.  I had not seen some

11  of these specific conditions, and I did have the opportunity

12  to speak with the presentence officer who wrote the

13  presentence report and was responsible for devising some of

14  these conditions and what I was told was --

15          MR. KELLOGG:  Your Honor, I'm going to object.  It's

16  not responsive to the question.  It's hearsay.  I realize that

17  there is a lesser standard here, but why the conditions came

18  into existence or what was intended by the conditions is not

19  at issue.  It's -- we're not contesting.  The conditions are

20  what they are in the exhibit.

21          THE COURT:  I would tend to agree.

22          MS. MILLER:  Actually, Your Honor, it's highly

23  relevant to the case, because the conditions that were put

24  into this particular defendant's judgment by the judge that

25  were devised by the probation officer were special conditions

1    because it was a financial case and because the Defendant was

2    hiding assets.

3              MR. KELLOGG:  I'm going to object to the fact that

4    there is an allegation of him hiding assets.  That's never

5    been established.  The government again is trying to poison

6    the well here, and --

7              THE COURT:  Well, you're not going to poison the

8    well with me.  I mean, let's be frank, but look, I don't think

9    it's necessary, Ms. Miller, because this is an R&R.  It'll be

10   sent to Judge Zilly.  Judge Zilly was the sentencing judge.

11   He will well know what the reason for the conditions were, so

12   it's not really necessary to lay that out.  I think we'll --

13   the -- the conditions will have to stand on their own and I'll

14   have to make a report and recommendation as to whether they

15   were violated or not.

16             MS. MILLER:  Can I just say one more thing, Your

17   Honor?

18             THE COURT:  Of course.

19             MS. MILLER:  I believe that they're further

20   important in that the conditions that they went over, that Ms.

21   Martinis went over with the Defendant in the questions that he

22   had pertaining to those conditions were because they were

23   extra special conditions related to his financial aspects of

24   the case, the allegations in this case go straight to the

25   heart of his finances.

1          THE COURT:  Well, I think that is kind of obvious.

2   I mean, you -- you can see what the -- what the conditions

3   are, and anyone who has done any sentencing knows what the

4   point of those are, so I -- I think you are probably covering

5   an area that doesn't need to be covered.

6          Q.   Okay.  Did the Defendant also talk to you about his

7   case and the sentence that was imposed?

8          A.   Yes, he did.

9          Q.   And what did he tell you?

10         A.   He indicated that he should never have plead.

11         MR. KELLOGG:  I'm going to object to this as not

12   relevant, Your Honor.  It's -- it's cumulative whether -- how

13   he feels about whether or not it was right to enter into a

14   plea agreement or what the sentence was.  It's --

15         THE COURT:  Mr. Kellogg, I am going to allow her to

16   testify about what the Defendant said, and I can -- I'll be

17   able to sort through whether it was relevant or not in my

18   determination of whether he's violated the conditions of

19   supervised release as alleged, so I just think it would be

20   more efficient to allow her to explain about what he said.  He

21   will be able to testify and rebut it, so -- and I can sort

22   through it.  So go ahead and answer.

23         THE WITNESS:  Again, he had stated that he should

24   have never plead to the offense and should have gone to trial,

25   that he originally plead to a much lesser term of imprisonment

1   and that the sentencing judge imposed more time that than he

2   plead to.  And to the best of my knowledge that was the extent

3   of it.

4        Q.   Did he also talk to you about his assets at that

5   time?

6        A.   Yes, he did.

7        Q.   And what did he tell you?

8        A.   He said he had none.

9        Q.   Did he also talk to you about his ex-wife?

10       A.   He did.

11       Q.   And her name is Alice Smith?

12       A.   Correct.

13       Q.   And what did he tell you about her?

14       A.   He indicated that she was letting him reside with

15  her and that he -- she was helping him get back -- transition

16  back into the community and that she was nice enough to, you

17  know, provide him the basic necessities.

18       Q.   At your first visit with the Defendant, did you also

19  ask him to sign a credit check authorization?

20       A.   I did.

21       Q.   And how did he respond to that?

22       A.   He was resistent initially, did not understand why

23  that needed to be done, but ultimately he did sign the credit

24  check.

25       Q.   And did you eventually run a credit check on the

1    Defendant?

2         A.   Yes, I did.

3         Q.   And did anything about that credit check cause you

4    concern?

5         A.   There were several credit checks conducted, so I'm

6    not certain if it was that specific one, but over the course

7    of the time I supervised him, there were some things that

8    caused concern.

9         Q.   Did you also conduct a home visit at the Defendant's

10   residence?

11        A.   Yes, I did.

12        Q.   And could you please tell the Court about his

13   residence.

14        A.   The residence is located in Oak Harbor, Washington.

15   It's a waterfront, I believe it's a condominium, a two-bedroom

16   residence, nicely furnished along the waterfront in Oak

17   Harbor.

18        Q.   During the course of your supervision with the

19   Defendant, did the subject of his fine come up?

20        A.   Yes, it did.

21        Q.   And what did he tell you about his fine?

22        A.   Well, initially he said he did not have the money to

23   pay it.  Ultimately he -- it was paid by Alice Smith, or a

24   personal check from Alice Smith.

25        Q.   And what did he have to say about that?

1    A.   He was surprised that she had paid it and stated

2  that she never should have paid it because she -- she was very

3  much in debt and he believed that it would have to be -- the

4  funds would have to be returned to her.

5    Q.   Now, during the course of your supervision with the

6  Defendant, you conducted several home visits?

7    A.   That's correct.

8    Q.   And did anything about those home visits stand out

9  as significant to you with regard to Defendant's finances?

10   A.   Typically Mr. Smith was at home almost every time I

11 contacted him there, and usually he would be either studying

12 or working at his dining room table, and one of the things

13 that was of concern were numerous credit cards on the table.

14 It looked as if he was working on sorting out his credit, and

15 when asked, that's what he, in fact, said he was doing.

16   Q.   And what was his demeanor when he was talking to you

17 about that?

18   A.   I would describe him as being somewhat nervous when

19 -- when explaining what -- why all the credit cards were on

20 the table and what he was doing with those credit cards.

21   Q.   During the course of your supervision, did the

22 Defendant ever submit a travel request?

23   A.   Yes, he did.

24   Q.   Can you please tell us a little bit more about that

25 request.

1        A.    I believe there were two, one was to Oregon and

2    another one was to Samoa.

3        Q.    Can you tell us about the one to Samoa.

4        A.    The one to Samoa was to check on the vessel, the

5    ALLIANCE I believe it is.  He had indicated that he wanted to

6    go check and see the status of the boat and to see if there

7    was anything left on the boat as far as equipment and what the

8    -- what the current state of the vessel was.

9        Q.    And did that conversation strike you as odd?

10       A.    It did, because the vessel was not reported as one

11   of his assets on any of the financial statements that he

12   submitted, and although there was reference of it in the

13   presentence report, he had not mentioned it throughout the

14   course of his supervision.

15       Q.    Can you please turn to Government's Exhibit 33.

16       A.    Okay.

17       Q.    What is that?

18       A.    This is a travel request to Samoa.

19       Q.    Is that the request that the Defendant submitted to

20   you?

21       A.    Yes.

22       Q.    And is the accompanying affidavit with that?

23       A.    Yes.

24            MS. MILLER:  Your Honor, I move to submit

25   Government's --

```
 1              MR. KELLOGG:  May I voir dire?

 2              THE COURT:  Sure.

 3                        VOIR DIRE EXAMINATION

 4  BY MR. KELLOGG:

 5      Q.   There is a two-page affidavit that follows the

 6  one-page travel request application.  Is it your testimony

 7  that the original application had the affidavit attached or

 8  did that come later?

 9      A.   Honestly I can't recall.

10      Q.   Do you recall whether or not you got the affidavit

11  from Mr. Smith or from a separate source?

12      A.   I don't recall.  I believe it was Mr. Smith, but I'm

13  not 100 percent certain.

14              MR. KELLOGG:  Well, I have no objection to the first

15  page of Exhibit 33, but the two pages following, I think

16  foundation is --

17              THE COURT:  I don't have a signed copy.  Was this

18  signed at some point?

19              MS. MILLER:  Which part of the exhibit?

20              THE COURT:  The typed -- the two typed pages.  There

21  is no signature.

22              MR. MILLER:  The affidavit, Your Honor?

23              THE COURT:  That's correct.

24              MS. MILLER:  I believe they were just typed.

25              THE COURT:  Well, then I think Mr. Kellogg is right.
```

1   It doesn't -- the first page doesn't -- unless I'm missing

2   something, doesn't refer to any other attachment, and the

3   attachment is not signed, unless you can tie it up with

4   someone other than Ms. Martinis providing the information that

5   she says she is not able to do.

6          MS. MILLER:  Well, Your Honor, there is some

7   handwriting at the bottom of page number three, or I guess

8   page number two of the affidavit, and I believe I can tie that

9   up with either Ms. Martinis or Mr. Bouma when he comes up to

10  testify.

11         THE COURT:  Okay.  I mean, if you can -- if you have

12  someone who can establish that these two pages were submitted

13  with the one-page travel request by Mr. Smith, then I'll admit

14  it, but if you can't, then I don't think you can lay the

15  foundation for that.

16         MS. MILLER:  Your Honor, I'll tie that aspect of

17  that up with Mr. Bouma since he has the probation file.

18         THE COURT:  That's fine.  I note it's got a

19  different date too.  The two-page document says March 18th,

20  and the travel request says April 27, so -- but that will be

21  fine.  So page one is admitted anyway.

22         MS. MILLER:   Thank you, Your Honor.  I have no

23  further questions for Ms. Martinis.

24         THE COURT:  All right.  Mr. Kellogg?

25                    **CROSS EXAMINATION**

**BY MR. KELLOGG:**

Q.   Ms. Martinis, you supervised Mr. Bouma for about a year; is that correct?

A.   Mr. Smith?

Q.   Yeah, I'm sorry.  Mr. Bouma may need supervision but not by you.  You supervised Mr. Smith for about a year; is that correct?

A.   Just under a year.

Q.   All right.  And you were his first probation officer supervising him; correct?

A.   Correct.

Q.   All right.  And then at the end of the year, Mr. Bouma substituted in your stead for supervision of Mr. Smith; is that correct?

A.   Correct.

Q.   Mr. Smith's term of supervision was for one year, was it not?

A.   It was.

Q.   So it was in the last file month of Mr. Smith's supervision in November -- I'm sorry, September of last year that Mr. Bouma assumed responsibility for the case; is that also correct?

A.   Approximately September I believe it was, yes.

Q.   And the reason for the transfer and responsibility of supervision is because Mr. Bouma kind of heads up the

 1   financial investigation arm of supervision for your office; is

 2   that true?

 3        A.   No, actually I was on maternity leave as of

 4   September.

 5        Q.   All right.  But it's also true that Mr. Bouma is one

 6   of two probation officers in the Western District that is

 7   responsible for financial investigations in these types of

 8   financial cases; isn't that correct?

 9             MS. MILLER:   Your Honor, I object.  He can ask Mr.

10   Bouma that when he testifies.  We shouldn't be asking --

11             THE COURT:   Well, it's all right.  Go ahead and

12   answer.

13             THE WITNESS:   He is a financial specialist for our

14   agency, yes.

15        Q.   Now, the primary recipient of restitution in this

16   case was the federal government, IRS; isn't that true?

17        A.   Correct.

18        Q.   Now, when you have restitution owed the federal

19   government, actually there is an IRS representative that sits

20   in on regular Probation Office assessments of a probationer's

21   reporting and conduct during the period of their supervision;

22   isn't that also true?

23        A.   What do you mean?

24        Q.   Staffing.  Staffing of -- staffing of cases in your

25   office, in the Probation Office.

1      A.   I don't know that that is the case on every, um,

2  case with IRS.

3      Q.   It was the case with Mr. Smith, was it not?

4           MS. MILLER:   Your Honor, again, I would have to

5  object.  I don't know how this is relevant to the allegations.

6           THE COURT:  Well, let's -- Mr. Kellogg?

7           MR. KELLOGG:  Well, Your Honor, we would like the

8  opportunity to be able to show the Court that there has been

9  an extensive and prolonged investigation since September as

10  well as before September of last year into the possibility

11  that Mr. Smith has hidden or secreted assets and what all that

12  has not been able to establish.

13           THE COURT:  Well, I don't think it's relevant when

14  it has not been established.  I think the question is whether

15  he has committed the alleged violations.

16           MR. KELLOGG:  I agree, Your Honor.  I guess -- I

17  guess I'm trying to establish something that just a few

18  minutes ago I was trying to not establish or have not

19  established.  I'll move on.

20           THE COURT:  Great.

21      Q.   Um, well, let's get back to this request for travel

22  to the fishing boat in American Samoa, or wherever it was.

23  That was April of 2004 after you had been supervising Mr.

24  Smith for four or five months; is that correct?

25      A.   Correct.

1     Q.   All right.  So he did not hide the fact that he had

2   some relationship with this boat; correct?

3     A.   Up until the -- once the travel request was

4   submitted, he did not hide the fact.

5     Q.   Well, he didn't -- he didn't -- he didn't pretend it

6   was for some other reason.  I mean, he was forthcoming with

7   the boat and why he wanted to go there and discuss that fully

8   with you; correct?

9     A.   Once the request was submitted, yes.

10     Q.   All right.  And he didn't hide the fact that he was

11   going school during the term that you supervised him for

12   almost one year; is that also true?

13     A.   That's correct.

14     Q.   You -- you were aware that he was attending classes

15   and what classes they were and things of that nature; correct?

16     A.   I was aware he was attending school.  Specifically

17   as to the questions -- or classes, I had an idea --

18     Q.   All right.

19     A.   -- of the classes.

20     Q.   And you never -- you never asked Mr. Smith about who

21   was paying for his school or how it was being paid for; isn't

22   that true?

23     A.   We had discussed the fact that he had received

24   scholarships for those courses.

25     Q.   All right.  Did Mr. Smith ever tell you that Alice

1   Smith was assisting by paying his tuition?

2        A.   I don't recall.

3        Q.   All right.  You didn't make a specific note of that;

4   is that correct?

5        A.   Correct.

6        Q.   As I understand your testimony, you got several

7   credit reports from Mr. Smith during the term of supervision;

8   correct?

9        A.   Yeah, at least two.

10       Q.   Do you recall ever discussing with Mr. Smith what

11  you found on those credit reports as to outstanding balances

12  or revolving balances or payments on credit cards that he had

13  during the term that you supervised him?

14       A.   I don't recall specifically.  I believe that we may

15  have discussed some of the transactions on the credit report,

16  but I can't be certain as to his -- to when or the details of

17  that.

18       Q.   Well, you were aware from the credit report what

19  those credit cards were and what the balances were and what

20  the payments were during the year that you were supervising

21  him; is that true?

22       A.   Based on the credit report, yes.

23       Q.   All right.  And when you went for one of several

24  home visits, and you testified that you saw Mr. Smith with

25  some credit cards on the table, you didn't ask him about the

1    credit cards then at that time, did you?

2        A.   I did.  I asked -- we talked about the credit cards

3    and I reminded him that he was not authorized to open any new

4    lines of credit without prior approval.

5        Q.   All right.  And all of the credit cards that you

6    were aware of from discussing with Mr. Smith and from the

7    credit reports that you had were not new lines of credit, that

8    they had actually been in existence prior to his original

9    sentencing; isn't that true?

10       A.   To the best of my recollection they were in

11   existence, yes.

12       Q.   Because that's one of the things that you would have

13   been looking for when you got those credit reports back;

14   correct?

15       A.   To make sure he did not open any new lines credit.

16       Q.   Right.

17       A.   Yes.

18       Q.   That he did not.

19       A.   Right.

20       Q.   Okay.  And thinking back to when you first met with

21   Mr. Smith and going over those conditions and concerns that he

22   had about authorizing credit checks was more from a standpoint

23   of confidentiality as far as having the credit report reflect

24   that the Federal Probation Office had access to them, isn't --

25   wasn't that true?

 1    A.   I don't -- I'm sorry, I don't recall.

 2    Q.   All right.  You didn't make a lot of notes from that

 3  initial interview you had with Mr. Smith; correct?

 4    A.   I -- I had chronological notes in our database, the

 5  Probation Office, which is standard for what I would typically

 6  do on any case.

 7    Q.   And you've reviewed those in preparation for your

 8  testimony here this afternoon?

 9    A.   I did.  I read them.

10    Q.   And it's about one paragraph, is it not?

11    A.   I would say it's about one paragraph.

12    Q.   All right.  And there is a lot of things in there,

13  his health problems, his plans for the future, his concerns

14  with the supervision release, all of the things that you

15  testified to previously, as well as some others; correct?

16    A.   Correct.

17    Q.   Do you recall talking to Alice Smith at a home

18  visit?

19    A.   Yes, I do.

20    Q.   All right.  Do you recall telling Alice Smith her

21  finances may be scrutinized as a result of Hugh Smith residing

22  there?

23    A.   Yes, I do.  I was present when Officer Lescher did

24  the prerelease investigation, and actually he was the one who

25  informed her of that.

1    Q.   All right.  So it was your understanding as part of

2    that prerelease and you're talking about before he is even out

3    on supervised release, the transition into the community, that

4    Alice was, in your words, going to provide the basics

5    necessities for him?

6    A.   I'm sorry, can you repeat that.

7    Q.   You were aware even before he started supervised

8    release that his release plan included his former wife, Alice

9    Smith, providing his basic necessities?

10   A.   I was aware that he was going to reside with her.  I

11   was not aware of -- if he would be able to work or what his

12   income would be at that time.

13   Q.   But I believe you testified on direct that the plan

14   included her providing his basic necessities.

15   A.   Once he was released.

16   Q.   Right.

17   A.   Correct.

18   Q.   Okay.  You knew that he had health concerns?

19   A.   After he was released.

20   Q.   You knew that he never worked during the time that

21   you supervised him?

22   A.   Correct.

23   Q.   He told you repeatedly that he was physically unable

24   to work; is that correct?

25   A.   That's correct.

1    Q.   When Mr. Smith was being supervised by you and filed

2    monthly reports or financial statements, you at no time

3    specifically questioned him about any of those reports or

4    things that he had put down; isn't that true?

5    A.   No, oftentimes I would have to return his monthly

6    reports to be completed or for signature or call one time one

7    was done in pencil.  I had to send it back to be, you know,

8    redone in pen, little things like that.  So we did talk about

9    things along the course of his supervision.

10   Q.   All right.  And he was somewhat responsive to

11   whenever those would be sent back; correct?

12   A.   Yes.

13   Q.   And that probably happened, what, two or three

14   times?

15   A.   At least two or three.

16   Q.   All right.  And you being I guess in the Seattle

17   area; is that right, and you were in Everett at the time you

18   were supervising Mr. Smith?

19   A.   That's correct.

20   Q.   Okay.  Would you make him drive him from Oak Harbor

21   monthly?

22   A.   No.

23   Q.   I take it that your home visits were probably a

24   total of two or three?

25   A.   I would say at least three.

1    Q.   Okay.  And do you recall how many times you had Mr.

2    Smith report to you in person in Everett from Oak Harbor?

3    A.   At least two.

4    Q.   Do you recall when those dates were?

5    A.   The initial release which was in -- on November 18.

6    Q.   Of 2003?

7    A.   Correct.  And actually in August I had -- I recall

8    having an appointment set for him to come in to discuss his

9    financial statements, but what I cannot recall is if that took

10   place due to my leave.

11   Q.   All right.  That would have been about the time that

12   Mr. Bouma assumed the case, your leave, his almost ending

13   supervision back in September of last year?

14   A.   Mr. Smith would have been ended in November.

15   Q.   All right.

16   A.   But, yes, it was --

17   Q.   It sounds like you are not even sure that there was

18   a second --

19   A.   That's what I'm -- I'm wondering if that --

20   Q.   Second office meeting.

21   A.   -- had transpired.  It was set up I know for a fact,

22   but I don't know if we had ever scheduled it, and then I went

23   on leave, and so, the case was then transferred to Mr. Bouma.

24   I would have to look at the file to be able to tell you for

25   certain.

1        Q.   The furnishings that you refer to at the condominium

2   in Oak Harbor, they were 20 years old?

3        A.   I'm not sure if I could pinpoint how old they were.

4             MR. KELLOGG:  If I might have just a moment, Your

5   Honor.

6             THE COURT:  Sure.

7             MR. KELLOGG:  No further questions.  Thank you.

8             THE COURT:  Okay.  Ms. Miller?

9             MS. MILLER:  Your Honor, I have just a little bit of

10  follow up.

11                     **REDIRECT EXAMINATION**

12  **BY MS. MILLER:**

13       Q.   Ms. Martinis, was a financial investigation opened

14  up in this case?

15       A.   By your office.

16            MR. KELLOGG:  Your Honor, that's the whole thing

17  that -- the area that I was not to go into and that I have

18  been objecting to before, and I submit --

19            THE COURT:  Well, I'm intrigued, because I'm not

20  sure what a financial investigation is.  Could you explain

21  that, Ms. Miller, a financial investigation.

22            MS. MILLER:  A financial investigation I believe by

23  the Probation Office when they have a defendant that they

24  believe is not reporting all of their assets or all of their

25  liabilities, they can open up a financial investigation where

1    they do things like run credit checks, check with the IRS, do

2    Choice Point investigation to try to figure out if the

3    defendant is, in fact, being honest with their office.

4              THE COURT:  And he is -- the allegations include

5    allegations include -- allegations that he filed a false

6    financial statement and false monthly reports, so how is that

7    different than just monitoring his compliance with

8    supervision?

9              MR. KELLOGG:  Your Honor, could I make a brief offer

10   of proof?

11             THE COURT:  Well, let me hear her answer then you

12   sure can.

13             MS. MILLER:   I'm sorry, Your Honor, can you repeat.

14             THE COURT:  How is what you are describing any

15   different than simply supervising him?  The allegations are

16   that he filed false financial reports, so I guess I don't

17   understand what a financial investigation is -- is different

18   than supervising him.

19             MS. MILLER:   Well, I believe, Your Honor, that the

20   Probation Office delves further into a defendant's finances by

21   conducting a financial investigation.  They open up a

22   financial investigation and -- to make a determination about

23   whether or not he is, in fact, hiding any assets or not

24   reporting them.

25             THE COURT:  And the reason for the inquiry is to see

1    if he is complying with the conditions of the supervision?

2              MS. MILLER:  That's correct, Your Honor.

3              THE COURT:  Okay.  So, Mr. Kellogg, what was it that

4    you wanted --

5              MR. KELLOGG:  Well, I think it goes beyond that,

6    Your Honor.  I think it goes into whether or not he has

7    secreted assets such that they might be attached to pay IRS in

8    this instance, and it's my understanding from representing Mr.

9    Smith that a financial investigation includes working closely

10   with IRS investigators, criminal agents.  There was a subpoena

11   to Mr. Smith's attorney for all of their records going back

12   for ten years this spring.

13             MS. MILLER:  Your Honor, I'm not sure --

14             THE COURT:  Well, let him finish.

15             MR. KELLOGG:  Well, that's -- that's part of what

16   has essentially happened here.  Karl Rove (sic) from IRS met

17   with Mr. Short, Mr. Smith's counsel and with Mr. Smith in the

18   fall of last year.  We submit that Mr. Rove (sic) or other IRS

19   agents have been meeting regularly with Probation during the

20   months of supervision throughout 2004 and in an effort to see

21   if Mr. Smith had assets which could be applied to the

22   restitution in this case.

23             That -- that subpoena that the attorney, Norm Short,

24   complied with resulted in Mr. Bouma and Mr. Rove (sic) from

25   IRS going to Mr. Short's office in Port Orchard and spending

1   the better half of a day leaving with several boxes of

2   documents and records going back years and years, including

3   the Smith family trust, Hugh Smith, Alice Smith, Offshore

4   Adventures, the fishing vessel ALLIANCE.  An incredibly

5   thorough financial investigation was done and nothing was

6   generated other than the allegations that are before the Court

7   now, and I agree that it's not relevant except to show that

8   that was what was done and how much scrutiny this individual

9   has been subjected to.

10          THE COURT:  Well, he is required to provide

11   financial information.  He is required to provide accurate

12   monthly report or I don't know how frequently reports are, I

13   guess monthly, to disclose all assets and liabilities, et

14   cetera, so regardless of what you say about the assets to see

15   if he should be paying restitution seems as though any

16   financial investigation would be appropriate in order to see

17   if he is complying with the conditions of supervision.  I just

18   don't see what the problem is, and so, the question was, did

19   you initiate a financial investigation?  There was an

20   objection and I'll overrule the objection as to that question

21   anyway.

22          THE WITNESS:  Based on, you know, some of the

23   concerns that came up throughout the course of supervision, we

24   did initiate a financial investigation, yes.

25          Q.   And when you say *we*, do you mean you?

1      A.   I, along with my, you know, I spoke with my

2 supervisor, with Cal being the financial specialist to get

3 some feedback.

4      Q.   And what sorts of things did you do, what sorts of

5 things did you check through your financial investigation?

6      A.   We did credit checks.  We did run what we call a

7 Choice Point and asked him to fill out financial statements.

8 I think he filled out at least two to report all of -- all of

9 the assets and liabilities that he might have.  And other than

10 that, I'm not sure what else we did.  I'm sure there was more,

11 but it's not coming to mind.

12      Q.   That's fine.  Thank you.

13           MR. KELLOGG:  Just a couple of follow-up questions,

14 Your Honor.

15                    **RECROSS EXAMINATION**

16 **BY MR. KELLOGG:**

17      Q.   When you referred to Cal as a financial specialist,

18 do you mean Mr. Bouma?

19      A.   Yes.

20      Q.   And, again, he is one of two in the Western District

21 in the probation office that are financial specialists?

22      A.   That's correct.

23      Q.   And that's because they have special training and

24 certification in the area of trying to discover assets that

25 may be secreted or hidden?

1      A.   Correct.

2      Q.   All right.  It's true, is it not, that as part of

3  the financial investigation, information shared with Internal

4  Revenue Service and their agents were sitting in on staffing

5  of Mr. Smith's supervision during the time you were

6  supervising him?

7           MS. MILLER:  Your Honor, again, how the IRS is

8  related to this, we dropped the allegations pertaining to the

9  IRS.  This is strictly a probation case.

10          THE COURT:  I'll allow the answer.  Go ahead.

11          THE WITNESS:  You know, I -- I recall meeting with

12 the IRS agent.  As far as the general staffing, I don't recall

13 that, no.

14     Q.   Would that have been Mr. Rove?  Or Rowe I guess it

15 is.

16     A.   There were a few.

17     Q.   More than one meeting?

18     A.   No, there was one meeting.

19     Q.   All right.  Did you have any involvement in IRS

20 conducting a similar type of investigation at the same time?

21     A.   Well, one of his conditions was to cooperate fully

22 with the IRS, so, yes, we worked together to make sure that

23 that condition was fulfilled.

24     Q.   And by that, you mean the Internal Revenue Service?

25     A.   Correct.

1          MR. KELLOGG:  Thank you.  No further questions.

2          THE COURT:  All right.  You may step down.  Thank

3   you.

4          THE COURT:  Next witness, Ms. Miller.

5          MS. MILLER:   Thank you, Your Honor.  The government

6   calls Calvin Bouma.

7          **CALVIN BOUMA**, after having been duly sworn in by the

8   Court testified as follows:

9          THE CLERK:  All right.  Please have a seat.

10         THE COURT:  Please state your full name.

11         THE WITNESS:  Yes, it's Calvin Bouma, B-O-U-M-A.

12                   **DIRECT EXAMINATION**

13   **BY MS. MILLER:**

14     Q.   Thank you, Your Honor.  Mr. Bouma, how long have you

15   been a probation officer?

16     A.   Approximately 15 years.

17     Q.   And you are considered a senior financial analyst.

18   What exactly does that mean?

19     A.   Well, I -- I competed for the position in which the

20   focus is to -- to develop programming and training for line

21   officers in the area of financial investigations.  Other than

22   that, my job is pretty much the same as another probation

23   officer.

24     Q.   And your position as a senior financial analyst, is

25   that the reason you took over this case after Ms. Martinis

 1   left for maternity?

 2        A.   I don't recall whether that was relevant at the

 3   time.  What I recall is that she was going out on leave, my

 4   supervisor came to me and said, I need somebody to cover some

 5   of Gina's cases and the case was assigned to me.

 6        Q.   And you took over supervision of Norman Smith in

 7   October of 2004?

 8        A.   That's correct.

 9        Q.   Did you speak with Ms. Martinis prior to taking over

10   the case?

11        A.   Yes.

12        Q.   And what kinds of information did she pass along to

13   you?

14             MR. KELLOGG:  Your Honor, I'm going to object to the

15   relevancy of that.  He did what he did.  We've already heard

16   from Ms. Martinis.

17             THE COURT:  Well, I suppose.  I don't see the harm

18   in hearing the answer, so maybe it's background.  I'll allow

19   it.

20             THE WITNESS:  Well, I remember she -- she consulted

21   me at one point when she had done some financial workup.  She

22   had looked at his credit report and analyzed it.  She had run

23   a Choice Point financial analysis, and she told me she had

24   concerns that he had unreported assets, unreported sources of

25   income, and she told me what her thoughts were and her ideas

1    about investigating the case and asked me for ideas.

2        Q.    Shortly after you took over supervising the

3    Defendant, you sought permission to execute a search upon his

4    residence and computer?

5        A.    That's correct.

6        Q.    And why was that?

7        A.    Well, after I looked at the case myself, I thought

8    there was grounds for a search to uncover information, because

9    he had -- first of all, I looked at the case and in the

10   presentence report --

11            MR. KELLOGG:  Your Honor, I'm going to object to the

12   narrative response.  I submit that he already answered the

13   question.  He got a search warrant, and why it was is because

14   he thought he had grounds.  What those grounds were is not

15   before us.  We're not challenging the propriety of getting a

16   search warrant.

17            THE COURT:  I'll allow it.  Go ahead.  I mean, it

18   helps me understand what the -- how the investigation --

19            MR. KELLOGG:  Your Honor --

20            THE COURT:  So I find it helpful.

21            THE WITNESS:  Okay.  In reviewing the presentence

22   report, in November of 2000 he had -- prior to November of

23   2000, he reported to Pretrial Services in the financial report

24   that he had assets of more than $100,000, including bank

25   account of 60,000, an investment account of 40,000.  He

1    reported that he had interest in the fishing vessel ALLIANCE

2    to total more than 300,000, or equity.  And he reported that

3    he transferred over $100,000 into a trust account, which was

4    proceeds of the safe of his primary residence in Bothell in

5    which he netted more than $250,000.

6            And then after getting out of prison and filing his

7    first financial statement, he reported no assets of any kind.

8    Additional ideas justifying the search were that he had,

9    according to his credit report, he was making payments on

10   individual accounts to the tune of between 250 and $500,000 --

11   excuse me 250 and $500 a month regularly every month, and yet,

12   he no reported source of income.  And, so, that was -- that

13   was the grounds for the search.

14       Q.   And did you execute that search in October of 2004?

15       A.   Yes, we did.

16       Q.   Can you please tell us about that search.  Where did

17   you search?

18       A.   We searched the entire condominium to include --

19   well, we searched the entire condominium.

20       Q.   When you say the entire condominium, are you talking

21   about where the Defendant resides with Alice Smith?

22       A.   That's correct.

23       Q.   And what did you seize while you were there?

24       A.   We seized financial records and a computer and some

25   computer disks.

1      Q.   And have you looked over the government's exhibit

2   notebooks, specifically at Exhibit 7A and C and 8 through 12?

3      A.   Yes.  I would like to refer to those now.  Okay.

4      Q.   Were those documents that you had seized from the

5   Defendant's residence and computer?

6           MR. KELLOGG:  I'm sorry, are we talking about --

7   what exhibits are we talking about?

8           THE COURT:  7A through C and 8 through 12.

9           THE WITNESS:  Yes, that's correct.

10          MS. MILLER:  And it's actually Exhibit 7A and B, not

11   C, Your Honor.

12     Q.   I would like to focus your attention to the

13   allegations now, Mr. Bouma.  Let's start with December 1st,

14   2003, the filing of a false financial statement.  I would

15   direct your attention to Exhibit No. 2A and 2B.

16     A.   Okay.

17     Q.   What are these exhibits?

18     A.   These are the financial statements which the

19   Probation Office uses to get financial information from

20   offenders.

21     Q.   So the financial statement consists of two parts?

22     A.   That's correct.

23     Q.   One is the net worth statement and the other one is

24   the cash inflow/outflow?

25     A.   That's correct.

1      Q.   And did the Defendant submit Exhibits 2A and 2B as

2   his financial statements for December 1st, 2003?

3      A.   Yes, he did.

4           MS. MILLER:  Your Honor, I move to admit

5   Government's 2A and 2B into evidence.

6           MR. KELLOGG:  No objection.

7           THE COURT:  2A and 2B are admitted.

8      Q.   Now, I would like to focus on the specific sections

9   of these exhibits.  I would like to draw your attention to the

10  instructions on the first page of Exhibit 2A.  Are these

11  instructions always included in the financial statement?

12     A.   My Exhibit 2A does not include the instruction page

13  but --

14          THE COURT:  Mine doesn't either.

15          THE WITNESS:  -- 2B does.  But, yes, they are --

16  they are part and parcel of both of the monthly cash flow as

17  well as the net worth statement, yes.

18          THE COURT:  Exhibit 2 has the cover sheet I think if

19  you look at that.

20          MS. MILLER:  Exhibit 2 being the December 2003

21  monthly report.

22          THE COURT:  Except I don't think that's what it is.

23  I'm sorry, the last page of Exhibit 2 I believe should be the

24  first page of Exhibit 2A.

25          MS. MILLER:  Your Honor, that's right.

1          MR. KELLOGG:  My first page of 2A says, instructions

2    for completing net worth statement after a square box.  Is

3    that what we're talking about?

4          THE COURT:  That's what we were talking about.  Mine

5    was in the wrong place in the binder.  That's all.  So I think

6    we've got that straightened out.  Go ahead.

7          THE WITNESS:  Yes.  The answer is, yes.

8     Q.   Okay.  So that specific page is included with the

9    financial statement that was sent to the Defendant?

10    A.   Correct.

11    Q.   Now, I would like to focus your attention on the

12   specific sections in this exhibit, specifically in Section A,

13   the Defendant only lists the Washington Mutual Bank account;

14   is that correct?

15    A.   That's correct.

16    Q.   And in Section B, does the Defendant list his

17   American Century investments account?

18    A.   No.

19    Q.   How about in Section D, does he list his life

20   insurance?

21    A.   No.

22    Q.   In Section I --

23          MR. KELLOGG:  I'm going to object to the form of the

24   question, assumes facts not in evidence.  The question is

25   ambiguous, his life insurance.  For the record, there is life

1    insurance policies insuring Mr. Smith's life, but it's not his

2    life insurance policy.  He doesn't own it.

3              THE COURT:  Well, I don't think it's an appropriate

4    objection.  I mean, she asked the question.  He answered it.

5    You can clarify or indicate that that is -- later that is

6    nonsensical or whatever, but I don't think there is anything

7    wrong with the question per say.  It may mean that the answer

8    is meaningless, but we'll hear that later.  Okay.  So you said

9    it didn't list the -- what was the other thing?

10             MS. MILLER:  The American Century investments

11   account in Section B.

12             THE COURT:  All right.

13        Q.   In Section I does the Defendant list any other

14   assets?

15        A.   He was -- assets included cash from his wallet of

16   $35 and that's it in that section.

17        Q.   In Section J does the Defendant list any anticipated

18   assets?

19        A.   No, none.

20        Q.   In Section K, does the Defendant list any business

21   holdings that he has or had an interest in or an affiliation

22   with in the past three years?

23        A.   No.

24        Q.   In Section M, does the Defendant list any transfer

25   or selling of assets?

1      A.    No.

2      Q.    And in Section P, does the Defendant list any

3  prospective increase in assets?

4      A.    No.

5      Q.    I would like to focus your attention to the

6  liabilities portion of Exhibit 2A, which I believe is the last

7  page of this particular exhibit.  Does the Defendant list any

8  debts, including any mortgages in Section B?

9      A.    In Section B, no.

10     Q.    And in Section A, what does the Defendant have

11 written as to his answer to charge accounts and lines of

12 credit?

13     A.    It says, *this area is a mess.  I am investigating*

14 *and will submit a listing at a later date.*  And it's initialed

15 by what looks like his initials.

16     Q.    And did he ever follow up and submit anything with

17 regards to Section A?

18     A.    No.

19     Q.    Let's move on to Exhibit B.  The instructions on the

20 first page of that, are those always included with the

21 financial statement for a defendant to fill out?

22     A.    Yes.

23     Q.    Did the Defendant list any business income in the

24 monthly cash flow statement?

25     A.    No.

1    Q.   Did he list any allowances in the monthly cash flow
2  statement?
3    A.   No.
4    Q.   Did he list any spouse or significant other's salary
5  in the monthly cash flow statement?
6    A.   No.
7    Q.   Did he list any other joint spousal income in the
8  cash flow statement?
9    A.   No.
10         MR. KELLOGG:  Your Honor, I'm sorry, I submit the
11  exhibit speaks for itself.  He was not a party to the taking
12  of this exhibit.
13         THE COURT:  Well, but, you know, actually this is in
14  lieu in argument.  I think she is -- I am just trying to grasp
15  the material, and obviously, of course it speaks for itself,
16  but her questions help me focus on it, so actually it's sort
17  of helpful to me, and I don't see it's harmful.  You are
18  right, the document speaks for itself.  She can use her time
19  as she chooses, so go ahead.
20    Q.   Did the Defendant list any other joint spousal
21  income in the monthly cash flow statement?
22    A.   No.
23    Q.   And did the Defendant list any other income of
24  others in the house in the monthly cash flow statement?
25    A.   No.

1      Q.   Did the Defendant list any other amounts received

2    each month in the monthly cash flow statement?

3      A.   No.

4      Q.   Did the Defendant list any credit card payments in

5    the necessary monthly cash outflow statement on page three?

6      A.   No.

7      Q.   Did the Defendant list any other necessary monthly

8    amounts paid and not yet reported in the necessary monthly

9    cash outflow statement?

10     A.   No.

11     Q.   In his monthly cash flow report, does he list

12   anywhere the transfer of the FV ALLIANCE or Offshore

13   Adventures?

14     A.   No.

15     Q.   Does he list any other debts such as to Caterpillar

16   Financial?

17     A.   No.

18     Q.   Let's go ahead and skip on to violation No. 3, which

19   is filing a false monthly report for May 2004.  I would draw

20   your attention to Exhibit No. 3.  What is that?

21     A.   That's the monthly report for May of 2004.

22     Q.   And when did the Probation Office receive this?

23     A.   It has a date stamp on it that was received on June

24   1st of 2004 at the U.S. Probation in Everett.

25     Q.   And this is the monthly report for the Defendant?

1      A.   Yes, that's correct.  I'm sorry, Norman Hugh Smith.

2           MS. MILLER:  Your Honor, I move to admit

3    Government's Exhibit No. 3.

4           MR. KELLOGG:  No objection.

5           THE COURT:  What about 2?

6           MS. MILLER:   Your Honor, I did -- I'm sorry, I

7    would move to admit Government's Exhibit 2A and 2B.

8           THE COURT:  You did 2A and 2B, but 2.

9           MS. MILLER:   Sure.  Your Honor, I move to admit

10   Government's Exhibit No. 2.

11          THE COURT:  As to 2 and Exhibit 3, Mr. Kellogg, I

12   think you already said about 3, but 2?

13          MR. KELLOGG:  No objection, Your Honor.

14          THE COURT:  Thank you.  All right.  Exhibit 2 is

15   admitted as is 3.

16     Q.   I would like to focus your attention on part D of

17   this monthly report.  What did the Defendant have listed as

18   his monthly cash inflows?

19     A.   $20.

20     Q.   And how about his cash outflows?

21     A.   $40.

22     Q.   You look at this section where it asks about his

23   financial account information, specifically his checking and

24   savings account.  What does he have listed?

25     A.   He has one account listed and a bank account at

1   Washington Mutual.

2        Q.   And it says that you can attach a complete listing

3   of all the financial information if you have multiple

4   accounts.  Did he attach anything?

5        A.   No.

6        Q.   And in part D it says, do you have -- *do you rent or*

7   *have access to a post office box?*.  What does the Defendant

8   list?

9        A.   *No.*

10       Q.   What was the Defendant's response to the question

11  asking if his spouse, significant other or dependent has a

12  checking or savings account that he enjoys the benefits of or

13  makes occasional contributions towards?

14       A.   Well, the answer he indicated was, *no.*

15       Q.   And did the Defendant list any expenditures over

16  $500?

17       A.   None.

18       Q.   Now, did the Defendant have a post office box at

19  that time?

20       A.   Yes.

21       Q.   And what did he call that box?

22       A.   I seem to remember he referred to it as his

23  *permanent address.*

24       Q.   I would draw your attention to Exhibit No. 29, and

25  have you seen this exhibit before?

1      A.   Yes.

2      Q.   And have you actually spoken with Marti Brown, the

3   president of The Mail Room?

4      A.   Yes, I have.

5      Q.   And did you talk to her concerning the Defendant?

6      A.   Yes.

7      Q.   And what did she tell you?

8      A.   She recognized Mr. Smith's name immediately and said

9   that he frequented her business and had a post office box

10   there and had been coming there for quite a while.

11          MS. MILLER:  Your Honor, I move to admit

12   Government's Exhibit No. 29.

13          THE COURT:  Mr. Kellogg?

14          MR. KELLOGG:  No objection.

15          THE COURT:  29 is admitted.

16      Q.   Now, anywhere in his monthly report from May, did he

17   list his Viking Bank account?

18      A.   No.

19      Q.   How about his American Century account?

20      A.   No.

21      Q.   Did he list his check from Maureen McKitterick?

22      A.   No.

23      Q.   I draw your attention to Exhibit No. 9.  Do you

24   recognize this exhibit?

25      A.   I do.  I recall we found this check during the

1    search in Mr. Smith's home.

2              MS. MILLER:  Your Honor, I would move to admit

3    Government's Exhibit No. 9.

4              THE COURT:  Mr. Kellogg?

5              MR. KELLOGG:  No objection.

6              THE COURT:  Exhibit 9 is admitted.

7         Q.   I would like to move on to violations No. 2 and No.

8    4 now, filing a false financial statement on or about

9    September 15, 2004 and filing a false monthly report for

10   September.  Specifically I would draw your attention to

11   Exhibit No. 4.

12        A.   This is the monthly supervision report for September

13   2004 from Norman Hugh Smith and it's date stamped received in

14   the Everett probation office, October 4, 2004.

15        Q.   And what is the date of the signature that the

16   Defendant signed?

17        A.   September 31st, 2004.  (Sic.)

18        Q.   I also draw your attention to Exhibits 4A and 4B,

19   what are those?

20        A.   4A is the declaration of the Defendant on the net

21   worth and cash flow statement and the monthly cash flow

22   statement.

23        Q.   And those are his financial statements --

24        A.   That's correct.

25        Q.   -- for September?

 1        A.    For September, yeah.

 2              MS. MILLER:  Your Honor, I move to admit Exhibit No.

 3    4, 4A and 4B.

 4              MR. KELLOGG:  No objection.

 5              THE COURT:  Exhibit 4, 4A and 4B are admitted.

 6        Q.    I would like to focus your attention back to Exhibit

 7    No. 4, part D.  What did the Defendant lists as his cash

 8    inflows?

 9        A.    $45.

10        Q.    And what did he list as his cash outflows?

11        A.    $20.

12        Q.    And what did he list in the checking account and

13    other financial information section?

14        A.    He indicated only one account there.  It was a

15    checking account at Washington Mutual Bank.

16        Q.    Did he attach any other form to this with another

17    listing of any financial account information?

18        A.    No.

19        Q.    And in that same section, part D, did the Defendant

20    list a post office box?

21        A.    No.

22        Q.    And what was the Defendant's response to the

23    question asking if his spouse, significant other or dependent

24    has a checking or savings account that he enjoyed the benefits

25    of or makes occasional contributions towards?

1          A.    The answer he indicated was, *no*.

2          Q.    And in that section it tells you that -- I'm sorry,

3    excuse me.  What did the Defendant list as expenditures for

4    over $500?

5          A.    He indicated there were none.

6          Q.    And did the Defendant still have a post office box

7    at that time?

8          A.    Yes.

9          Q.    And, again, does the Defendant list a Viking Bank

10   account anywhere on his monthly report?

11         A.    No.

12         Q.    I would like to move on to Exhibit 4A and 4B,

13   starting with 4A.  Does the Defendant list any business income

14   in the monthly cash flow statement?

15         A.    No.

16         Q.    How about any allowances?

17         A.    No.

18         Q.    Does he list any unknown spouse, significant other

19   salary -- I mean, does he list any spouse or significant other

20   salary in the monthly cash flow statement?

21         A.    No.

22         Q.    Does he list any other joint spousal income in the

23   monthly cash flow statement?

24         A.    No.

25         Q.    How about any other income of others in the house in

1    the cash flow statement?

2         A.   No.

3         Q.   Does he list any mortgages or loans in the monthly

4    cash flow statement?

5         A.   No.

6         Q.   Does he list any other amounts received that month

7    in the monthly cash flow statement?

8         A.   No.

9         Q.   Does he list any prospective increase in cash

10   inflows in that statement?

11        A.   No.

12        Q.   Does he list any credit card payments in the

13   necessary monthly cash outflow statement?

14        A.   No.

15        Q.   Does he list any other necessary monthly amounts

16   paid and not yet reported in the necessary monthly cash

17   outflow statement?

18        A.   No.

19        Q.   Focusing your attention on Exhibit 4B, does the

20   Defendant list any other bank accounts besides Washington

21   Mutual in Section A of the net worth statement?

22        A.   No, that is the only one.

23             THE COURT:  Let me interrupt, Ms. Miller.  I think I

24   have it now, so I -- I think at this point the exhibit does

25   speak it for itself and I will -- unless there is something

1    different.

2              MS. MILLER:  There is nothing different, Your Honor.

3    It's the same.

4         Q.   I would like to draw your attention to Exhibit 7A

5    now.  What is this exhibit?

6         A.   This is a copy of the check that we confiscated

7    during the search of Mr. Smith's house in October of 2004.

8         Q.   And how about Exhibit 7B, what is that?

9         A.   This is a copy of a -- of an account statement which

10   pertains to the preceding exhibit, the check, and we also

11   found this statement in Mr. Smith's residence during the

12   search.

13             MS. MILLER:  Your Honor, I move to admit Exhibits 7A

14   and 7B.

15             MR. KELLOGG:  No objection.

16             THE COURT:  7A and 7B are admitted.

17        Q.   After finding these two exhibits, Exhibits 7A and &B

18   at the search, did you follow up with American Century

19   Investments about this check?

20        A.   Yes.

21        Q.   And what did you learn from them?

22        A.   I learned that they will not automatically disperse

23   a check when an account matures.  As per company policy, they

24   contact the recipient to verify, first of all, the address,

25   and -- before they send the -- they send the check out, and

1    they had done so in this case.

2         Q.    I draw your attention to Exhibit -- Government's

3    Exhibit 7C.

4         A.    This is a subpoena to the American Century

5    Investments.

6         Q.    If you can turn to page three of that exhibit.

7         A.    This is a letter dated August 6 addressed to --

8    addressed to Hugh Smith at the address, the post office box,

9    and it -- it identifies -- it indicates to him that his

10   account is nearing maturity and that they need him to provide

11   a W-9 form for tax purposes.

12        Q.    And is this the letter that they spoke of when you

13   had a conversation with them?

14        A.    That's correct.

15        Q.    And if you can turn to page -- to page number four.

16   What is that?

17        A.    This -- this appears to be a fax from Hugh Smith to

18   American Century Investments referring to the same account.

19   And in the fax he indicates the trust has recently matured,

20   and *I'm enclosing a W-9 form.  Please close the account and*

21   *mail the net check to the above address.*  It appears from the

22   date on the top that this was faxed on June 14, 2000 -- oh,

23   I'm sorry, September 21, 2004.  The document appears to be

24   faxed by American Century on June 14, 2005.

25        Q.    And the next page, the substitute W-9 form, does

1    anything strike you --

2        A.   Yes, it did.  When I reviewed this, I noted the

3    social security number provided by Mr. Smith was not the

4    social security number which I had on his -- on his court file

5    and appearing in his presentence report.  It was -- it was

6    noticeably different, the digits.  The other thing I noted is

7    that the signature on the W-9 form did appear to match his

8    signature.

9        MS. MILLER:  Your Honor, I move to admit

10   Government's Exhibit 7C.

11       MR. KELLOGG:  No objection.

12       THE COURT:  7C is admitted.

13       Q.   And if you can turn to the last -- second to last

14   page of that exhibit, the one right after the substitute W-9.

15   What is that?

16       A.   This is a report issued by American Century.  It's a

17   stop payment report and it indicates that Hugh Smith called

18   and indicated to them that the check had been lost and a --

19   they were going to issue a stop payment on the check.

20       Q.   And issue a new check?

21       A.   That's correct.

22       Q.   Now, I would like to take you back to the social

23   security number that you say was noticeably different on the

24   substitute W-9 form.  Did you follow up on that?

25       A.   Yes, I did.  I contacted the Social Security,

1    Division of the Inspector General's Office.

2         Q.   And what did you find out?

3         A.   They indicated to me after some amount of

4    investigation that Mr. Smith, in fact, had two social security

5    numbers.  They said that his original social security number

6    which was on the presentence report, which was the one I knew

7    to be his social security number had been issued when he was a

8    young man, I believe around his 17th birthday or something.

9         And then subsequently 20 or 30 years later he

10   applied for a social security number again, and on the

11   application indicated he had never received a social security

12   number.  And then when he was incarcerated at Sheridan, he

13   applied for a social security replacement card indicating he

14   had lost his card, and in doing so, he referred to his

15   original social security number, the first one which he had

16   been issued.  They told me that they would have closed the

17   second account down and notified him that he was not to use

18   that and the account was being closed, that that number was

19   going to be closed down.

20        Q.   Let's move on to this Viking Bank account.  During

21   your search of the Defendant's residence, did you find any

22   documents that led you to believe that the Defendant had more

23   than one bank account?

24        A.   Yes, we did.

25        Q.   And what was that?

1     A.   We found a bank statement from the Viking Bank

2  pertaining to an account and Mr. Smith's name was on the

3  account.

4     Q.   And I would like you to turn to Government's 8D.

5     A.   Yes, this is the bank statement which we confiscated

6  during the search pertaining to the Offshore Adventures

7  account, and the second name under Offshore Adventures is

8  Norman Smith, and it's -- the address on there is his PO box

9  in Bothell.

10          MS. MILLER:  Your Honor, I move to admit

11  Government's Exhibit 8D.

12          THE COURT:  MR. Kellogg?

13          MR. KELLOGG:  No objection.

14          THE COURT:  8D is admitted.

15     Q.   And what was the date of that statement?

16     A.   September 30 of 2004.

17     Q.   The first name on the top of that statement is

18  Offshore Adventures, Incorporated.  Just real briefly, what is

19  your understanding of Offshore Adventures?

20     A.   My understanding is that this is a company which was

21  set up by Mr. Smith, and it's a fishing company that fishes

22  primarily for tuna and there is a vessel registered to that

23  company called the ALLIANCE.

24     Q.   And the third name that is listed on that account is

25  Alice Smith.  During the course of your supervision of the

1    Defendant, what have you learned about Alice Smith and her

2    relationship with the Defendant?

3        A.    I've learned that they were married in 1964 and were

4    divorced in 1986, and that according to Mr. Smith's daughter

5    they have never lived apart until the present time.

6        Q.    You mean they're still living together at the

7    present time?

8        A.    That's correct.

9        Q.    So with the exception of his prison term, they've

10    never lived apart?

11        A.    Correct.

12        Q.    I would like you to turn to Government's Exhibit 8A,

13    B, C and E.  If you could look at each of those exhibits.

14        A.    Okay.  Exhibit No. 8A is a --

15            MR. KELLOGG:  I object to an answer.  There is no

16    question pending.

17            THE COURT:  True.

18        Q.    What are these exhibits?

19        A.    8A is a copy of checks on the Offshore Adventures'

20    account which is at Viking Bank.  It's the one that we

21    referenced earlier in the exhibit, the same one, and --

22        Q.    Before we get into the details of that exhibit, how

23    about 8B, what is that?

24        A.    To clarify, 8A was confiscated during the search of

25    his residence.  8B is a copy of additional checks written on

1   that account which were also recovered during the search.

2       Q.   How about 8C?

3       A.   8C is a copy of other checks which were recovered

4   during the search his residence.

5       Q.   And how about 8E?

6       A.   8D is another -- well, that is the exhibit we

7   referred to earlier which was recovered during the search.

8   It's a monthly bank statement.

9       Q.   8E.

10      A.   Oh, I'm sorry, 8E?

11      Q.   Yes.

12      A.   That's is another check on that same account written

13  to Skagit Valley College and signed Norm Smith, and that was

14  also recovered during the search of his residence.

15           MS. MILLER:  Your Honor, I move to the admit

16  Exhibits 8A, B, C and E.

17           MR. KELLOGG:  No objection.

18           THE COURT:  8A, B, C and E are admitted.  I've

19  already admitted 8D.

20      Q.   Mr. Bouma, if you could please turn back to

21  Government's Exhibit 8A.

22      A.   Okay.

23      Q.   Why did you confiscate Government's Exhibit 8A

24  during your search?

25           MR. KELLOGG:  Objection.  Not relevant.

1          THE COURT:  Overruled.

2          THE WITNESS:  Well, I noted that I had recalled that

3    he had declared he only had one bank account, and that he no

4    interest in any corporation or entities.  When I found this,

5    it indicated to me he had signature powers on this account,

6    and -- as evidenced by negotiated checks which were made out

7    and signed by him, the signature on which appear to be the --

8    his signature as I knew it at that time.

9          Q.   And specifically you are referring to the two checks

10   at the bottom of the pages?

11         A.   That's correct.

12         Q.   And what is the date on the bottom left check?

13         A.   It's check No. 9652 and it's September 14, 2004.

14         Q.   And who is that made out to?

15         A.   INGUSA.

16         Q.   And who is INGUSA?

17         A.   That's the company that holds Mr. Smith's life

18   insurance policy.

19         Q.   And what about the date on the check to the right of

20   that?

21         A.   It looks like September 15, 2004 made out to

22   Discover Platinum Card and signed by Hugh Smith.

23         Q.   And if you turn the page, what is the date on that

24   check?

25         A.   That one is September 15 as well of 2004 made out to

1    Henderson Jones-Short and signed by Hugh Smith.

2        Q.   And were all of these checks negotiated?

3        A.   Yes, they were.

4        Q.   Did the Defendant report any of these checks or

5    liabilities or debts to you on the September monthly report?

6        A.   No, he did not.

7        Q.   Did he list any of these in his financial statement?

8        A.   No.

9        Q.   And did he list his bank accounts in his financial

10   statement?

11       A.   No.

12       Q.   Let's go through Government's Exhibit 8B?

13       A.   These are more checks written on the same account.

14   The first one appears to be August of 2000 written to

15   Equitable, which is the account -- or the company that owned

16   life insurance policy before they were bought out by INGUSA

17   and it appears to be signed by Hugh Smith.

18       Q.   And given that that check was so old and written out

19   in August of 2000, did you follow up with that insurance

20   company?

21       A.   Yes, we did.

22       Q.   And what did you find out with -- find out with

23   regard to how long the Defendant had the policy in relation to

24   his supervised release?

25       A.   The policy had been in effect for at least years

1    before he was -- he was on supervised release.

2              THE COURT:  Can I make sure I know what I'm looking

3    at.  Is this Exhibit 8B, the check at the top of 9406?

4              MS. MILLER:   Yes, Your Honor.

5              THE COURT:  And you are saying the payee is who?

6              MS. MILLER:   Equitable.

7              THE COURT:  Equitable.  Okay.  Thank you.

8         Q.   And just to clarify, Equitable is the company that

9    owned the life insurance policy before INGUSA bought them out?

10        A.   That's correct.

11        Q.   And who is the maker of that check?

12        A.   Hugh Smith.

13        Q.   Now, I would turn to -- I would ask you to turn to

14   Government's 8B, the last page of that exhibit.

15        A.   Last page of the same exhibit?

16        Q.   Same exhibit of 8B.  It's page number three.

17        A.   Okay.  This is a check written on that same account

18   at Viking Bank and it's made payable to cash in the amount of

19   $1,350 written on December 22, 2003 and signed by what appears

20   to be Hugh Smith.

21        Q.   Thank you.  Now, if you can turn to -- if you can

22   turn to Government's Exhibit 8C.

23        A.   This is another -- another group of checks written

24   on that same account, various dates.  The second check down

25   from the top is written in August 28 of 2000 to Equitable

1    signed by Hugh Smith.

2        Q.   Thank you.  If you could please turn to Government's

3    Exhibit 8E, what is that?

4        A.   This is a check written on the same account written

5    on August 13, 2004 to Skagit Valley College in the amount of

6    $850 signed by Norm Smith.

7        Q.   Was that check ever negotiated?

8        A.   No, it was not.

9        Q.   And I guess just to clarify, some of these checks

10   are signed by Norm Smith and some of them are signed by Hugh

11   Smith.  Does the Defendant go by both names?

12       A.   That's correct.

13       Q.   Based upon this information, did you follow up with

14   Viking Bank?

15       A.   Yes, I did.

16       Q.   And what did you find out?

17       A.   I found out that Mr. Smith's was the -- had been on

18   the account and was the second listed name on the account

19   under Offshore Adventures and that he had negotiated checks,

20   and the people at the bank indicated he had also directed wire

21   transfers out of the account.

22       Q.   Can you please turn to Government's Exhibits 11B and

23   11C.

24       A.   11B is a copy of a fax to Viking Bank from Norman

25   Smith and requested them to transfer $5,000 to the attention

1   of Reginald Macomber in Fiji at a Fiji bank.

2        Q.   And who is that?

3        A.   As far I know he is the agent for the fishing vessel

4   ALLIANCE.

5        Q.   And if you return to Government's Exhibit 11C, what

6   is that?

7        A.   This is a -- copy of a note to Norman and it says,

8   *please call regarding wire, Sue at Viking Bank.*  And attached

9   to it is a blank outgoing wire transfer order form from Viking

10  Bank.

11       Q.   And what was the date of that fax?

12       A.   September 10, of 2004.

13       Q.   And were both of these exhibits, exhibits that you

14  found in the search?

15       A.   That's correct.

16            MS. MILLER:  Your Honor, I move to admit

17  Government's 11B and 11C.

18            THE COURT:  Mr. Kellogg?

19            MR. KELLOGG:  No objection.

20            THE COURT:  11B and C are admitted.

21       Q.   If you can turn your attention now to Government's

22  Exhibit 11A.  What is that?

23       A.   It appears to be a copy of an email message from APA

24  Marine to HNS Smiths, and it's directed to Hugh and it -- it

25  discusses the fishing vessel and some actions going on at the

1    time and it requests -- requests them to take action and it's

2    signed from Reggie.

3         Q.   And was this document recovered from the Defendant's

4    computer?

5         A.   That's correct.

6         Q.   And it says account name, Reginald Macomber.   Is

7    that the same Reginald Macomber that is referenced in 11B?

8         A.   That's correct.

9              MS. MILLER:  Your Honor, I move to admit Government

10   Exhibit 11A.

11             MR. KELLOGG:  No objection.

12             THE COURT:  11A is admitted.

13        Q.   I would like to draw your attention to Government's

14   Exhibit No. 10.   What is that?

15        A.   This is a notice of premium due on the life

16   insurance policy ING, and it indicates that the insured is

17   Norman Smith.   It's sent to Norman Smith at a post office box

18   in Bothell, and it indicates payment of $1,807.50 is due on

19   September 8, 2004.

20        Q.   And who is the insured on that policy?

21        A.   Norman Smith.   Norman A. Smith.

22        Q.   And where did you find this exhibit?

23        A.   This was recovered in the search his residence.

24             MS. MILLER:  Your Honor, I would move to admit

25   Government's Exhibit No. 10.

1          MR. KELLOGG:  No objection.

2          THE COURT:  Exhibit 10 is admitted.

3     Q.   Mr. Bouma, I would like to move on to the credit

4   checks done on the Defendant.  If you could please turn to

5   Government's Exhibit 5A, B and C.  Can you please tell us what

6   those exhibits are.

7     A.   Okay.  5A is a credit check done on Norman Smith,

8   and this one was done on November 21, 2003.  And then 5B is

9   also a credit check done on Norman Smith and it was done on

10   May 10, 2004.  And the next one is another credit check done

11   on the -- on the Defendant, and the date is October 15, 2004.

12     Q.   And were those done as part of the financial

13   investigation that the Probation Office conducted on the

14   Defendant?

15     A.   That's correct.

16          MS. MILLER:  Your Honor, I move to admit

17   Government's Exhibit 5A, B and C.

18          MR. KELLOGG:  No objection.

19          THE COURT:  5A, 5B and 5C are admitted.

20     Q.   If you could please turn back to Government's

21   Exhibit 5A. If you could please explain to the Court what

22   stood out to you about this credit check.

23     A.   Well, it indicates under the credit summary that

24   there are payments being made in the monthly amount of $687 on

25   revolving credit accounts, including installment -- in

1    addition to installment payments of $1,374.  And that would be

2    -- installment payments would be a different type of loan.  It

3    would not be a secured -- it would not be a revolving credit

4    card.  It would be like a loan or a mortgage or a recreation

5    loan.

6              And then turning to the specific accounts, when you

7    review the -- some of the accounts, there are accounts which

8    are -- the credit history indicates they're up-to-date and had

9    not been delinquent during the time they were reviewed in the

10   last 24 months and they indicate that the payments had been

11   made on time in the amounts indicated under the terms section,

12   which is, for example, the second one down.  It's a revolving

13   credit card.  The payment is $145 a month, and judging from

14   the credit history to the right of that, that payment had been

15   made on time for the last 24 months.

16             It shows a credit limit of $5,100 and a balance due

17   of $4,943, so after reviewing this, it appeared to me Mr.

18   Smith was using credit.  He was -- he was continuing to

19   purchase things on credit, and he was making his payments on

20   time.  Now, when I separated out, there were a few of these

21   accounts which were joint, and a few that were individual.

22   When I separated those out and added them up, I came out with

23   -- on the order of over the three credit reports anywhere

24   between 250 and $500 that was being made every month by Mr.

25   Smith on individual accounts.  If I included the amounts being

1    paid on the joint accounts, the amount was closer to 600 to
2    $800 a month that had been made reliably every month.
3        Q.   Thank you.  And if you could turn to Government's
4    Exhibit 5B.
5        A.   And 5B would be the credit report for May 10, 2004.
6        Q.   And what struck you about that report?
7        A.   Much the same thing.  He was continuing to use
8    credit and his balances were increasing.  The monthly payments
9    were being made on time, which indicates that he had resources
10   from some -- from some source in order to make the payments,
11   so much the same thing as the first credit report.
12       Q.   And how about Government's Exhibit 5C?
13       A.   In this case the picture started to change.  Many of
14   the accounts became delinquent and were either referred to
15   collection or were closed.
16       Q.   And this one was in October of 2004?
17       A.   That's correct, October 15 of 2004.
18       Q.   And the Defendant filed bankruptcy in September of
19   2004?
20       A.   That's correct.
21       Q.   Were any of these credit cards that he was
22   continuing to accumulate credit on in Government's Exhibit 5A
23   and B, were any of those reported to you in any of the monthly
24   reports?
25       A.   No.

1        Q.   Now, if you please take a look at Exhibits 12N and

2    12O.  Can you please tell the Court what those exhibits are.

3        A.   12N is an annotated resume that appears to pertain

4    to Norman Smith when he was at the federal prison camp in

5    Sheridan, Oregon, and as I recall, this was -- this was taken

6    from the forensic search of his computer.

7             MS. MILLER:  Your Honor, I move to admit

8    Government's Exhibit 12N.

9             MR. KELLOGG:  Object to the relevancy.

10            MS. MILLER:   Your Honor, I can -- I can tie that

11   up.  I can ask him some more questions.

12       Q.   If you would please turn to page three of that

13   annotated resume.

14       A.   Okay.

15       Q.   Under social activity, what is the first

16   professional society?

17       A.   *Western Fish Boat Owners Association, member from*

18   *1994 to the present time.*

19       Q.   And have you had contact with the Western Fish Boat

20   Owners Association recently?

21       A.   Yes, I have.  I spoke with Wayne who the executive

22   director of the Western Fish Boat Owners Association, and he

23   indicated that Mr. Smith was a member in good standing and had

24   paid his -- his association dues.  And I think he indicated

25   that -- that he was aware of the fact that Mr. Smith was

1   having financial troubles as evidenced by the word that --

2   that Mr. Smith owed several people money on the accounts of

3   his boat, ALLIANCE.  He also indicated he was aware that Mr.

4   Smith had been responsible for building the boat and that he

5   had known him for some time and that he, in fact, had observed

6   Mr. Smith's website which recreated the building of the boat

7   and spoke in the first person about how Hugh Smith had, in

8   fact, built the boat.

9        MR. KELLOGG:  Your Honor, I'm going object.  This

10  goes back ten years or more, the building of the boat, the

11  reference to the website I think is from '97.  I think the

12  boat was built in '95.  I object to the relevancy of his

13  testimony.  It's hearsay.  It may be interesting but it's not

14  relevant.

15       THE COURT:  Overruled.  Ms. Miller, can you -- is

16  there some reason this is relevant?

17       MS. MILLER:   Your Honor, it's just relevant as with

18  regards to the FV ALLIANCE and Offshore Adventures and I guess

19  the history that the Defendant has with this boat, how it

20  pertains to the allegations that are before you.

21       THE COURT:  Well, okay.  Um, I'll allow some more of

22  it, but it seems a little remote.

23     Q.   What else about this resume stood out to you

24  specifically with Offshore Adventures, Incorporated?

25     A.   Well, you know, in the resume Mr. Smith indicated

1   that he obtained financing and contracted for the vessel to be

2   built.  He spent four months with the builders of the ship.

3   He researched and purchased the equipment.  Basically from

4   what I read on the resume, it appears that had been

5   instrumentally involved in the ship from the onset, and yet,

6   he is not reporting that he has any equity in the vessel or

7   any interest in the corporation.

8          MS. MILLER:  Your Honor, I'd again move to admit

9   Government's Exhibit 12N.

10          MR. KELLOGG:  I'm going to object to the relevancy,

11   Your Honor.  It's so ridiculously removed from the time

12   difference in the testimony.  There is no bearing.  It's not

13   -- it's not like this is false or there is an allegation that

14   is before the Court.

15          THE COURT:  Well, I can see how there might arguably

16   be some relevance, so I'll admit it.

17          Q.   I draw your attention to Government's Exhibit 12O.

18          A.   Okay.  These are grade reports from Indiana

19   University which pertain to Hugh Smith and indicate that he

20   had taken classes, including basic accounting skills,

21   introduction to financial accounting and another class which

22   appears to be a history class and then introduction to

23   managerial accounting, introduction to microeconomics.  The

24   grades received all appear to be at the A level and it

25   pertains to the time frame of when he was -- approximately

1    when he was incarcerated.

2         Q.   And where did you find this grade card?

3         A.   We found these in the search of his residence.

4              MS. MILLER:  Your Honor, I move to admit

5    Government's Exhibit 120.

6              MR. KELLOGG:  Same objections.  He was in prison in

7    Sheridan when he was taking classes.  How does that go to the

8    allegations that are before us?

9              THE COURT:  Ms. Miller?

10             MS. MILLER:  Your Honor, it goes to the show that

11   the Defendant knew what he was doing as far as his financial

12   statements.

13             THE COURT:  That he is a smart guy.

14             MS. MILLER:  Right.

15             THE COURT:  Okay.  Well, I'll admit it.  I don't see

16   any harm, but, I mean, I think Mr. Kellogg's point is pretty

17   well taken.  There is no dispute that 120 accurately depicts

18   his school records, so I'll admit that.

19             MR. KELLOGG:  Well, I'll agree he is a smart guy.

20   Let me move on.

21        Q.   Mr. Bouma, with regards to The Mail Room post office

22   box, did he ever start disclosing this post office box to the

23   Probation Office?

24        A.   Yes, he did in approximately October of 2004 as I

25   recall.

1      Q.   And I would like to focus your attention now to the

2   FV ALLIANCE.  What is the FV ALLIANCE?

3      A.   It's a 100-foot fishing vessel which, according to

4   my understanding, fishes predominantly for tuna fish in the

5   western Pacific Ocean.

6      Q.   When you searched the Defendant's residence, did you

7   find documents relating to the FV ALLIANCE and Offshore

8   Adventures?

9      A.   That's correct, we did.

10     Q.   And are those exhibits marked as 12A through 12M?

11     A.   Yes.

12     Q.   I would like to focus your attention on Exhibit 12A?

13     A.   12A is paperwork which appears to be copies of --

14  taken from a website pertaining to the ALLIANCE and describes

15  her maiden voyage and her building and a lot about the vessel.

16     Q.   And where did you find this with regards to your

17  search?

18     A.   In Mr. Smith's residence.

19          MS. MILLER:  Your Honor, I move to admit

20  Government's Exhibit 12A.

21          MR. KELLOGG:  If I might have just a moment?

22          THE COURT:  Go ahead.

23          MR. KELLOGG:  Your Honor, I'm going to object to the

24  relevancy of this.  It's dated July 17, 1996.

25          THE COURT:  Well, Ms. Miller's point is that,

1    ultimately she's going to show that the ALLIANCE was an asset.

2    Mr. Smith will most likely argue there was not a need to list

3    it for whatever reason that I haven't heard his position yet,

4    but she's trying to set a background to I guess anticipatorily

5    impugn the credibility of an assertion that I have not heard

6    made yet, but for purposes of I guess judicial efficiency,

7    I'll allow it in, because I get the point.  And I guess I can

8    see how this might be relevant, depending on what the defense

9    is, so we'll go ahead and admit 12A.

10       Q.   Mr. Bouma, if you could please turn to Government's

11   Exhibit 12B.

12       A.   This is a registration form which registers an EPIRB

13   device with the National Oceanic Atmospheric Administration,

14   and it pertains to the vessel ALLIANCE, and it's -- it's

15   indicated on this ship the owner -- on this -- it indicates

16   that the owner of the vessel is Norman N. Smith.

17       Q.   And does it give you a date of when it was first

18   registered and when it expires?

19       A.   It indicated it was first registered May 31, 1995

20   and that it expired March 11, 2005.

21       Q.   And was this found when you were searching his

22   residence?

23       A.   I'm sorry, and then it was edited March 11, 2003.

24   Yes, we did locate this during the search of his residence.

25            MS. MILLER:  Your Honor, I move to admit

1   Government's Exhibit 12B.

2          MR. KELLOGG:  Well, I'm going to have the same

3   objection as I did in 12A to all of these.

4          THE COURT:  All right.  12B is admitted and I

5   understand the basis of the objection.

6      Q.   I would like to focus your attention on Government's

7   Exhibit No. 12C.

8      A.   We obtained this during the search of Mr. Smith's

9   residence at well.  It's an ernest money agreement for cash

10  purchase and sale of the vessel through the Dock Street

11  Brokers, which is a firm here in Ballard.  And it indicates

12  that they were planning to transfer ownership of the vessel

13  from a -- from Hugh Smith who is indicated as the owner to a

14  man named Paul Schoenes, S-C-H-O-E-N-E-S.

15     Q.   And what is the date of that?

16     A.   Well, I think in the bottom paragraph on the first

17  page it indicates that there is to be something which

18  transpires before April 15 of 2000.

19     Q.   You can turn to page four of that exhibit.

20     A.   The -- is that the page with the signatures?

21     Q.   Yes.

22     A.   Okay.

23          THE COURT:  Is that the Bate number at the bottom,

24  220?

25          MS. MILLER:   That's correct, Your Honor.

1              THE WITNESS:  Right, this page is an addendum and

2    it's signed on the bottom by Hugh Smith, president of Offshore

3    Adventures, and the signature block is identified as seller's

4    signature dated January 31 of 2000.

5              MS. MILLER:  Your Honor, I move to admit

6    Government's Exhibit 12C.

7              MR. KELLOGG:  Same objection.

8              THE COURT:  Okay.  12C is admitted.

9         Q.   And I'd like you to turn your attention to

10   Government's Exhibit 12D and 12DD.  What are those?

11        A.   12D is a survey report which indicates that the -- a

12   marine survey conducted a survey of the ALLIANCE on June 12,

13   2002 at the request of Hugh Smith to determine the condition

14   and present day value.  And it indicates at that time a market

15   value of $850,000.  And it's dated -- well, June -- looks like

16   the survey was completed June 12, 2002.

17        Q.   And how about 12DD?

18        A.   That's another survey, and this one is completed by

19   Marvin Henderson August 14 of 1999 on the FV ALLIANCE.  And it

20   indicates that it was requested by Mr. Hugh Smith, Offshore

21   Adventures and it -- it indicates a market value of

22   approximately $800,000.

23        Q.   And where were these exhibits found?

24        A.   In the search of Mr. Smith's residence.

25             MS. MILLER:  Your Honor, I move to admit

1    Government's Exhibit 12D and DD.

2              MR. KELLOGG:  Same objection.

3              THE COURT:  12D and DD are admitted.

4         Q.   I'd ask you now to turn to Government's Exhibit 12E.

5         A.   12E is what appears to be a stock purchase agreement

6    made November 21 of 2000 and the involved parties are Morgan

7    Davies and Ruth Arkless who are listed as the buyers and Alice

8    Smith, trustee of the Smith family trust listed as the selling

9    stockholder and Offshore Adventures.  And it outlines a sale

10   in which the buyers to acquire stock, and as I seem to recall

11   also the vessel, and it lays out the -- essentially the

12   contract whereby the stock in the vessel were to change hands

13   in the contractual agreement under by which that would take

14   place.

15        Q.   And if you could flip through that exhibit to

16   Government's -- Bates No. 21.  That's about eight pages.

17        A.   Okay.  This looks like a signature page and the --

18   the signatures included are the buyers, Morgan Davies, Ruth

19   Arkless and selling stockholder, the Smith family trust by

20   Alice Smith, trustee and Offshore Adventures, Inc. by Norman

21   Hugh Smith, president.

22        Q.   And where was this found?

23        A.   In the search of Mr. Smith's residence.

24             MS. MILLER:  Your Honor, I move to admit this

25   exhibit.

1          MR. KELLOGG:  Same objection.

2          THE COURT:  Same objection?

3          MR. KELLOGG:  Yes.

4          THE COURT:  12E is admitted.

5     Q.   If you could, please, flip to Government's Exhibit

6  12F and 12G.

7     A.   First is a letter which -- which is written to Ruth

8  and Morgan, which I assume are Ruth and Morgan Davies who were

9  operating the vessel ALLIANCE and who were previously referred

10 to in the previous exhibit and it's written by and initialed

11 by Hugh Smith.

12    Q.   And how about 12G, what is that?

13    A.   That's a fax to Alison Hugh Smith from Morgan and

14 Ruth Davies.

15    Q.   And is there a date on that fax?

16    A.   Yeah, it looks like April 5, 2002.

17    Q.   And where did you find Government's Exhibit 12F and

18 G?

19    A.   In the residence of Mr. Smith.

20    Q.   Now, who are the Davies, Ruth and Morgan?

21    A.   According to documents that we recovered that Mr.

22 Smith submitted to the Coast Guard, they are -- they were

23 hired by him to captain and operate the fishing vessel, FV

24 ALLIANCE.

25    Q.   And is the Defendant's still currently involved with

1   them to your knowledge?

2       A.   Yes, I understand there is a court case involving a

3   dispute between the parties, and recently there was some

4   action heard by that by Judge Coughenour.

5       MS. MILLER:  Your Honor, I would move to admit

6   Government's 12F and G.

7       MR. KELLOGG:  This is even more remote than the

8   other documents about the ALLIANCE.  There was some kind of

9   dispute.  This is correspondence in the year of 2000 for the

10  sale of the boat that fell through at that time.  We have the

11  documents of sale surveys on the boat.  I don't -- I submit at

12  some point in his life it was probably relevant, but I don't

13  think it's before you now.

14      THE COURT:  Well, it's hard for me to tell because

15  I'm just not into them enough to really determine that, but

16  they were found at the residence.  They do relate to this

17  vessel, which we've heard a lot about.  They're apparently

18  from him, or at least there's no indication they were not, so

19  given that, I don't know about weight, but we will admit F and

20  G.

21      Q.   If you could please turn to Government's Exhibit 12

22  H.

23      A.   This is an affidavit that we recovered from Mr.

24  Smith's computer which was submitted to the Coast Guard.  And

25  the Coast Guard verified they had received this affidavit and

1    that Mr. Smith was making a complaint that his vehicle had

2    been essentially stolen by the captain, Morgan Davies.

3           In the affidavit Mr. Smith refers to himself as the

4    president of Offshore Adventures, the owner of the FV

5    ALLIANCE.  He indicates he built the vessel and fished it

6    himself until his physical condition made that no longer

7    possible, and that in the beginning of 1998 he hired Morgan

8    Davies to operate the boat.  And it goes on to talk about the

9    fact that he -- he and the agent decided to change the captain

10   in mid to late 2003 and that they gave Morgan Davies one last

11   chance and that he did not respond.

12       Q.   And the date of this affidavit is March 22, 2004?

13       A.   That's correct.

14           MS. MILLER:  Your Honor, I move to admit

15   Government's Exhibit 12H.

16           MR. KELLOGG:  No objection.

17           THE COURT:  12H will be admitted.

18       Q.   Based upon this affidavit, did you follow up with

19   the Coast Guard?

20       A.   I did.  I spoke to Special Agent Tom Gage of the

21   Coast Guard who indicated he was assigned to this

22   investigation, and he indicated that he closed the

23   investigation and stated that it was not relevant, and he said

24   that his personal feeling based on the --

25           MR. KELLOGG:  Your Honor, I'm going to object to the

1  further response being hearsay.  It doesn't go to any of the

2  allegations.

3          THE COURT:  Let me just ask you, can you make an

4  offer of proof of what he is about to say, Ms. Miller?

5          MS. MILLER:  Yes, Your Honor, I believe that it's

6  based upon what we anticipate the Defendant is going to say or

7  what Mr. Kellogg has already argued, that the Defendant had

8  written to Samoa and Fiji because his wife or his ex-wife,

9  Alice Smith, could not represent herself as the president of

10  Offshore Adventures because they were foreign countries, and,

11  um, so that they wouldn't deal with a woman, and so, therefore

12  he had to.  This is a Coast Guard affidavit, a United States

13  Coast Guard affidavit that he filed on March 22 of 2004.

14  Based upon that, Mr. Bouma spoke with the agent involved in

15  this case who discussed with him his communications with the

16  Defendant pertaining to the ownership of the FV ALLIANCE.

17          THE COURT:  But it sounds like that Tom Gage, is

18  that his name?  Gage, Tom Gage?

19          MS. MILLER:   Yes, Your Honor.

20          THE COURT:  Speculated or surmised something about

21  the reason --

22          MS. MILLER:  I don't want to go into that.

23          THE COURT:  I think you should avoid that.  In terms

24  of what he said or faxed that he provided to Mr. Bouma, that

25  is okay.  You can go into that.  We do a lot of hearsay, but

1   there has to be a limit, so that would be okay, so you may

2   inquire about that on the record.

3           MS. MILLER:  Thank you, Your Honor.

4       Q.  Can you tell us about your conversation in that

5   regard with Mr. Gage.

6           MR. KELLOGG:  Your Honor --

7           THE COURT:  No, I think Mr. Bouma heard what I said.

8   We're not interested in hearing -- sounded like where you were

9   about to go into was Mr. Gage speculated that, or surmised

10  that, and then of course we didn't hear what the answer was,

11  but you should eliminate that type of information from your

12  response when you are telling us what Mr. Gage told you.  But

13  you can answer what he told you factually, if that is clear.

14  If it is not, I'm sure Mr. Kellogg will object further.

15          THE WITNESS:  Okay.  He told me he was closing his

16  investigation as unfounded and that the captain of the vessel

17  had told him that he had --

18          MR. KELLOGG:  Double hearsay.  Objection.

19          THE COURT:  I'll take it in the light that it is

20  double hearsay, but go ahead.

21          THE WITNESS:  His investigation indicated that the

22  captain of the vessel told him that he had dealt primarily

23  with Hugh Smith regarding the vessel, regarding the

24  instructions of how to operate the vessel and the business of

25  the vessel.

1          MR. KELLOGG:  Your Honor, I'm going to ask that that

2  be stricken, because he could have been talking about 1998,

3  1999.

4          THE COURT:  Well, you can cross examine him.

5          MR. KELLOGG:  I'm sorry?

6          THE COURT:  Him.  I understand it's double hearsay.

7  It will be taken in that light, but it's not per say

8  excludable.  It may not be very reliable, but go ahead.

9      Q.   I would like to draw your attention to Government's

10  Exhibit 12I.

11      A.   This is a fax to John Grosseto from Hugh Smith

12  regarding insurance coverage, and it's a request for a

13  quotation for insurance coverage on the FV ALLIANCE, and it's

14  dated June 30 of 2004.  And we -- we recovered this from a

15  forensic search of his computer that was taken from the

16  residence.

17      Q.   And, I'm sorry, the date on that is?

18      A.   June 30, 2004.

19          MS. MILLER:  Your Honor, I would move to admit

20  Government's Exhibit 12I.

21          MR. KELLOGG:  I'm sorry, I'm a little confused about

22  the date.

23          THE COURT:  What was the June 30, 2004 date?  That

24  was the date of the search?

25          THE WITNESS:  No, the search was conducted in -- in

1    October of 2004.  The date on the facsimile transmittal --

2              MS. MILLER:   It's Government's Exhibit 12I.

3              THE COURT:  Right, but I don't see the date that he

4    just mentioned on the exhibit.

5              THE WITNESS:  It's in the blocks in the middle of

6    the transmittal.

7              THE COURT:  This is 2I?

8              THE WITNESS:  12I.

9         MR. KELLOGG:  He is looking at 2L.

10             THE COURT:  No, I'm looking at 2I.

11             MR. KELLOGG:  No, the witness is looking at 2L.

12             THE COURT:  I don't see, Mr. Kellogg.  Show me what

13   you're looking at.

14             THE WITNESS:  I'm looking at this exhibit here.

15             THE COURT:  He is looking at something different.

16   He is looking at 12L, Ms. Miller.  Didn't you ask him about

17   12I?

18             MS. MILLER:   I did.  Your Honor.

19             THE WITNESS:  Oh, I'm sorry.  I miss -- I mistook

20   the L for an I.  Okay.  Let's go to 12I.  This is a letter

21   from Norman Smith and this was obtained from Norm Smith's

22   computer, and it indicates that -- it's -- discussing the I

23   think the disagreement between Morgan Davies and the -- and

24   Mr. Smith and it identifies the agent of the ship as Reggie

25   Macomber.

1      Q.   And what is the date of this letter?

2      A.   February 4, 2004.

3      Q.   And who -- who wrote this letter?

4      A.   Well, it's -- it says, *thank you for your time from*

5  *Norman Smith.*

6      Q.   And where was this document recovered?

7      A.   From Mr. Smith's computer.

8           MS. MILLER:  Your Honor, I move to admit

9  Government's Exhibit 12I.

10          MR. KELLOGG:  No objection.

11          THE COURT:  12I is admitted.

12     Q.   You can move on to Government's Exhibit 12J.  What

13 is that?

14     A.   12J is a copy of an email from HNS Smiths, and it's

15 sent to the attention of Graham Southwick.  It's dated March

16 2nd, 2004, and it indicates that the ALLIANCE is in Fiji

17 without the permission of its owners.  It relates to the

18 dispute essentially between Hugh Smith and the Davies.  It

19 identifies Norman Smith, president, as the sign-off and it

20 says, *I am the president of Offshore Adventures, the owner of*

21 *the vessel.*

22     Q.   And the date of that email is?

23     A.   March 2, 2004.

24     Q.   And where was this recovered?

25     A.   From Mr. Smith's computer.

1          MS. MILLER:  Your Honor, I move to admit

2    Government's Exhibit 12J.

3          MR. KELLOGG:  No objection.

4          THE COURT:  12J is admitted.

5      Q.   If you could please look at Government's Exhibit

6    12K, what is that?

7      A.   It's a letter to Mr. -- Mr. Hugh Smith from a law

8    firm and it's regarding Morgan Davies and Ruth Davies, and it

9    indicates that they confirm receiving a summons and complaint

10   issued out of Kitsap County and that it was served upon the

11   Davies and -- yeah, that's what that's about it.

12     Q.   What is the date of this letter?

13     A.   April 2nd, 2004.

14     Q.   And where was this found?

15     A.   In Mr. Smith's residence.

16          MS. MILLER:  Your Honor, I move to admit Government

17   Exhibit 12K.

18          MR. KELLOGG:  No objection.

19          THE COURT:  12K is admitted.

20     Q.   If you can move to Government's Exhibit 12L.

21     A.   Okay.  And I think this is the one I got started on

22   in the wrong exhibit, so it's a fax transmittal to John

23   Grosseto from Hugh Smith regarding insurance coverage dated

24   June 30, 2004, and it's on Offshore Adventures and it

25   indicated that it's signed off by Hugh Smith, typewritten

1  signature and says, *we would appreciate a quotation for*

2  *coverage on the FV ALLIANCE.*

3      Q.   And where was this fax found?

4      A.   On Mr. Smith's computer.

5          MS. MILLER:  Your Honor, I move to admit

6  Government's Exhibit 12L.

7          MR. KELLOGG:  No objection.

8          THE COURT:  12L is admitted.

9      Q.   If you could move to Government's Exhibit 12M.

10     A.   This is an estimate for repairs and invoice for

11  diesel parts for a marine diesel engine from a company in

12  Salem, Virginia, and it indicates that -- to bill Hugh Smith

13  and ship to Hugh Smith.

14     Q.   And what is the order date?

15     A.   Oh, it's July 21, 2004.

16     Q.   And where was this document found?

17     A.   In Mr. Smith's residence.

18     Q.   And did you contact Blue Ridge Diesel to find out

19  what types of parts they sell?

20     A.   Yes, I did.  They indicated they sell exclusively

21  parts for boat engines.

22         MS. MILLER:  Your Honor, I move to admit

23  Government's Exhibit 12M.

24         MR. KELLOGG:  No objection.

25         THE COURT:  12M is admitted.

1    Q.   Mr. Bouma, what else can you tell us about the

2    Defendant and his relationship to the FV ALLIANCE and Offshore

3    Adventures.

4         MR. KELLOGG:  Your Honor, I am going object to that

5    as calling for speculation and surmise by the witness.  He has

6    testified factually.

7         THE COURT:  Well, I understand your objection, but

8    -- and I'll take this in the form of -- this is essentially

9    argument, and I understand the point Ms. Miller is trying to

10   make, and I'm going to be hearing the defense's response.

11   It's --

12        MS. MILLER:   Your Honor --

13        THE COURT:  It's essentially argument.

14        MS. MILLER:   I can ask him more specifically.

15        THE COURT:  That would be helpful.

16   Q.   Okay.  How does the FV ALLIANCE and Offshore

17   Adventures tie in with the Viking Bank account?

18   A.   Mr. Smith indicated to me during the search of his

19   residence that Viking Bank account was a banking account

20   established to handle the financial matters of the FV

21   ALLIANCE.

22   Q.   And have you spoken with anyone else regarding the

23   Defendant and this boat?

24   A.   Yes, I have, numerous parties.

25   Q.   Specifically did you speak with John Gannon?

1      A.   Yes, I did.

2      Q.   And who is that?

3      A.   He is an individual who owns a company here in

4  Seattle.  It's a maritime industry, and he indicated that he

5  was negotiating to purchase the FV ALLIANCE, and I asked him

6  if -- I asked him who -- I asked him some questions about --

7  about his negotiations with the company and he indicated that

8  --

9           MR. KELLOGG:  I'm going object as nonresponsive.

10          THE COURT:  Well, it's getting a bit narrative, so

11  maybe ask another question.

12     Q.   Can you specifically tell us what John Gannon told

13  you about the Defendant.

14          MR. KELLOGG:  Your Honor, I submit that this is the

15  kind of hearsay that is beyond detail for revocation hearings.

16  It's an out-of-court declarant talking about other things.  We

17  have no basis for his personal knowledge to assess his

18  personal knowledge for the response.  It could be what he

19  surmised or what he thought.  I'd ask that the question be

20  rephrased more directly.

21          THE COURT:  What was the question?  Do you remember?

22  What did he tell you?

23          MS. MILLER:  I believe what did Mr. Gannon tell you

24  with regards to his conversations with the Defendant.

25          THE COURT:  I'll allow it.

1      THE WITNESS:  He indicated that he was aware that on

2  paper the president of Offshore Adventures was Alice Smith,

3  but that all of his -- all of his contacts of substance

4  regarding the vessel were with Hugh Smith.

5      Q.   And when did you speak with Mr. Gannon?

6      A.   This would have been...

7      Q.   Has it been since you have taken over supervision?

8      A.   Oh, yes.  It would have been -- it would have been

9  probably in the spring of this year.  I don't recall the exact

10  date.

11      MR. KELLOGG:  Your Honor, I'm going to ask that if

12  there is any written notes that Mr. Bouma has with regard to

13  conversations or interviews with this witness, Gannon, or any

14  other witnesses, that they be produced for me prior to cross

15  examination of Mr. Bouma.

16      THE COURT:  I'll -- what I would ask -- we're not

17  going to finish today because we only have a few more minutes,

18  have those turned over to me and I'll take a look at then in

19  an in camera basis.

20      MR. KELLOGG:  And that would be not only the

21  witness, Gannon but other similar witnesses which were

22  referred to through this witness' testimony.

23      THE COURT:  That's right.  Thank you.

24      MR. KELLOGG:  Thank you.

25      THE COURT:  Is that is okay?

1          THE WITNESS:  Sure.  Yeah.

2      Q.   Mr. Bouma, can you tell us what you learned with

3  regards to the Defendant in Caterpillar Financial.

4      A.   Yes, from a review of documents which we obtained

5  during the search of Mr. Smith's residence and from his

6  computer, it appears that he -- that he applied for a marine

7  mortgage, in essence, a loan from Caterpillar Financial on the

8  FV ALLIANCE and that he was the sole signatory at the outset

9  when that account was generated, and that he was successful in

10  getting a -- a mortgage on the -- on the ship and that he

11  signed a certificate of no liens in order to -- in order to be

12  granted that marine mortgage.  And he was the sole signer on

13  that and signed that as the president of Offshore Adventures.

14          MR. KELLOGG:  Your Honor, I'd ask that we find out

15  when we're talking about in time within the last ten years.

16          THE COURT:  Can you be more specific.

17          THE WITNESS:  You know, without -- without reviewing

18  --

19      Q.   Has it been some time since you have taken over

20  supervision with the Defendant?

21      A.   Yes.

22          MR. KELLOGG:  No, I'm asking about when -- when Mr.

23  Smith is alleged to have entered into this security agreement

24  with Caterpillar.

25          THE COURT:  Right.  Exactly.

1          THE WITNESS:  Yeah, I think that I can come up with

2   that relatively quickly.  I seem to recall that it was in

3   about 1995, but I'll have to double check that to be sure.

4   That -- that the loan was originated in 1995.

5          MR. KELLOGG:  It goes to the weight I suppose.

6          THE COURT:  It would.

7          MR. KELLOGG:  But it's important to know that.

8          THE COURT:  Right.  But you could ask that in the

9   cross examination too.  Now we know.

10          MR. KELLOGG:  Thank you.

11     Q.   Now, Mr. Bouma, you are aware that the Defendant

12   filed bankruptcy in September of 2004?

13     A.   Yes, that's correct.

14     Q.   And did you have an opportunity to look at his

15   bankruptcy petition?

16     A.   I have.

17     Q.   And is that Government's Exhibit No. 28?

18     A.   Yes, it is.

19     Q.   And in -- what stood out to you in that bankruptcy

20   petition?

21          THE COURT:  I don't have anything in Exhibit 28.

22          MS. MILLER:   I'm sorry, Your Honor, we accidently

23   put it under No. 29.

24          THE WITNESS:  I remember when I reviewed it there

25   was -- the Viking back account was not listed.  The retirement

 1    -- well strike retirement.  The account at American Century

 2    Investments was not listed.  The life insurance policy was not

 3    listed.

 4            THE COURT:  Is the first page, the document this is

 5    form B1, United States Bankruptcy Court, Western District of

 6    Washington voluntary petition?

 7            MS. MILLER:   That's correct, Your Honor, and then

 8    all of the schedules are attached to that form.

 9        Q.   Specifically with regards to the bankruptcy

10    petition, did anything stand out to you with regards to

11    Caterpillar Financial?

12        A.   Oh, yes, he had claimed that he was a personal

13    guarantor for a loan to Offshore Adventures and was claiming

14    that -- that the claim by Offshore Adventures was in the

15    amount of $140,000, and that was on schedule F, creditors

16    holding unsecured non-priority claims.

17            MS. MILLER:  And, Your Honor, I would move to admit

18    Government's Exhibit No. 28.

19            THE COURT:  Exhibit 28?

20            MR. KELLOGG:  I'm going to object to the relevancy,

21    Your Honor.  This is not an allegation of supervised release

22    violation.  I don't know for what purpose it's being offered.

23    It's --

24            THE COURT:  You mean the filing of bankruptcy is not

25    a supervised release violation?

1          MR. KELLOGG:  No, Your Honor.

2          THE COURT:  Right.  I agree with that, but isn't the

3    point that this might show discrepancy between what was listed

4    as financial assets or liabilities and what is on the

5    petition?

6          MS. MILLER:   That's correct, Your Honor.

7          THE COURT:  That's the point.

8          MS. MILLER:  Yes.

9          THE COURT:  So on that basis it will be admitted.

10     Q.   Mr. Bouma, on any of the Defendant's monthly reports

11   or financial statements, did he ever list Caterpillar

12   Financial mortgage?

13     A.   Never.

14     Q.   Now, Mr. Bouma, if you could turn to Government's

15   No. 31.

16     A.   Okay.  This appears to be an email written to Kelly

17   Hoyle of the Coast Guard by Hugh Smith.

18     Q.   And where was this document recovered?

19     A.   From his computer.

20     Q.   And what is the date of this email?

21     A.   March 30th of 2004.

22          MS. MILLER:  Your Honor, I move to admit

23   Government's Exhibit 31.

24          MR. KELLOGG:  May I have a just a second, Your

25   Honor?

1            THE COURT:  Yes.

2            MR. KELLOGG:  No objection.

3            THE COURT:  All right.  Exhibit 31 is admitted.

4       Q.   Mr. Bouma, can you please turn to Government's

5   Exhibit No. 32.

6       A.   Yes, this is another email which was recovered from

7   Mr. Smith's computer as well, and actually it appears to be

8   two emails.

9       Q.   I would like to focus your attention on the email

10  after number eight and Smith windows at the bottom half of the

11  page.

12      A.   Okay.  It looks like an email from HNS Smiths to

13  American Pacific Agency, and it discusses the -- it discusses

14  the boat and matters pertaining to the boat.  It's addressed

15  to Reggie who I believe is Reggie Macomber, the agent, and it

16  is signed off Hugh, H-U-G-H.

17      Q.   And what the date of that email?

18      A.   June 29 of 2004.

19           MS. MILLER:  Your Honor, I move to admit

20  Government's Exhibit No. 32.

21           MR. KELLOGG:  Your Honor, my objection to 32 has to

22  deal with the top half of the page which appears to be a 2001

23  email, which I --

24           THE COURT:  That sounds like that is not being

25  offered; is that right?

1      MS. MILLER:   That's correct, Your Honor.

2      THE COURT:  I am going to cross that out and

3 indicate that it's not offered.  So the portion of the exhibit

4 that is offered is one that starts with eight and stops at

5 nine, or does it continue?

6      MS. MILLER:   The email stops at nine, Your Honor.

7      THE COURT:  Stops at nine.  Okay.  So email eight

8 from Exhibit 32 is admitted.

9      MR. KELLOGG:  And nine and ten will be stricken?

10      THE COURT:  Is that right, Ms. Miller, you are not

11 offering those.

12      MS. MILLER:  No, I'm not, Your Honor.

13      THE COURT:  Nine and ten are stricken.

14      Q.   Now, Mr. Bouma, in the email under eight where it

15 says, *I talked to Cat,* do you know what that is referring to?

16      A.   Well, I would assume that is Cat Financial who is

17 the mortgage holder on FV ALLIANCE.

18      Q.   Mr. Bouma, I would draw your attention to

19 Government's Exhibit No. 34 and 35.

20      A.   Okay.

21      Q.   Have you had the opportunity to look at those before

22 today?

23      A.   Yes, I have.

24      Q.   And specifically I would draw your attention to page

25 number two after this certification.

1    A.   With the copied checks on them or the previous page?

2    Q.   The previous page.  It says, document name untitled.

3    A.   Okay.

4    Q.   And what is this?

5    A.   Well, it's a listing of the signatory names on the

6    account, and the first is Offshore Adventures, name number two

7    is Norman Smith and name number three is Alice Smith, and the

8    address for the account is the post office box in Bothell.

9    Q.   And if you could turn to page number three.

10   A.   And these are copies of negotiated checks that were

11   sent by the bank.

12   Q.   And specifically the first check on that page to

13   WFOA...

14   A.   That's the Western Fish Boat Owners Association and

15   the check is filled out in the amount of $325,000.  The

16   notation indicates it's for 2005 fees and it's signed by what

17   appears to be Hugh Smith's signature.

18   Q.   And what is the date of that check?

19   A.   October 9, 2004.

20        MS. MILLER:  Your Honor, I move to admit

21   Government's Exhibit No. 34.

22        THE COURT:  34?

23        MR. KELLOGG:  No objection.

24        THE COURT:  34 admitted.

25        MS. MILLER:  Your Honor, I have no further

1    questions.

2            THE COURT:  All right.  Are there some exhibits you

3    are not offering?

4            MS. MILLER:   That's correct, Your Honor.

5            THE COURT:  All right.  Let's just make sure.  Now,

6    exhibits -- well, the ones that have not been offered are 6,

7    13 through 27.

8            MS. MILLER:   That's correct, Your Honor.

9            THE COURT:  30, 32, 33.

10           THE CLERK:  33 was right in the very beginning.

11           THE COURT:  Okay.  Make sure that --

12           THE CLERK:  I have 32 -- well, the bottom.

13           THE COURT:  33, you are right.

14           THE CLERK:  32 was the email, the number eight one.

15           THE COURT:  Did I miss 32?  Oh, yes, 32 was

16    admitted.

17           MR. KELLOGG:  31, 32, and 33 are admitted.

18           THE COURT:  And 34.  And then not 35, 36, 37; is

19    that right?

20           MS. MILLER:  That's correct, Your Honor.

21           THE COURT:  Okay.  Good.  Rather than start, I think

22    what we'll do is rather than start with cross examination,

23    let's adjourn and let's find another date.  Next week is the

24    judicial conference, so that is not good, but the week after

25    would work for me or the first week in August.

1          THE WITNESS:  Your Honor, can I stand down and get

2    my calendar?

3          THE COURT:  Yes, you can.

4          MR. KELLOGG:  Can we go to the first week in August?

5    I have a civil trial the week of the 25th.

6          THE CLERK:  We could do it on let's see, Tuesday the

7    2nd we could start at 10:30.

8          THE COURT:  Let's be sure we have enough time to

9    finish.

10          THE CLERK:  Friday the 5th we have all day.

11          THE COURT:  Why don't we do that.  Does that work

12    for everyone?

13          MR. KELLOGG:  Yes, Your Honor.  The government is

14    through asking Mr. Bouma on direct; is that correct?

15          THE COURT:  That's right.

16          MR. KELLOGG:  Well, I can say that both Ms. Miller

17    and I are terrible estimates of time.

18          THE COURT:  I knew that.

19          MR. KELLOGG:  I can't imagine taking more than half

20    a day but...

21          THE COURT:  Well, let's start in the morning.  I'm

22    going to hold the whole day open, because I don't want to have

23    to come back.  It's just too much to remember frankly, so --

24    and I'm going to need some significant argument to explain

25    what is relevant and what the defense feels about the

1    relevance, so shall we start at 9:30?

2              MR. KELLOGG:  That's fine, Your Honor.

3              THE COURT:  Like I said, I'll just hold the day open

4    unless something comes up, and if I can no longer do that,

5    I'll let you know.

6              MR. KELLOGG:  And we'll be notified if it's in this

7    courtroom?

8              THE COURT:  Right, it should be downstairs, so

9    assume that unless you hear from us.  All right?

10             MS. MILLER:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             THE CLERK:  All rise.  Court is in recess.

13                   (Proceedings concluded 3:54 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2   STATE OF WASHINGTON  )

3                        ) SS

4   COUNTY OF KING       )

5           I, Donna Hunter, Certified Shorthand Reporter and

6   Notary Public duly and qualified in and for the State of

7   Washington do hereby certify that the foregoing transcript is

8   a true and correct transcript of my original stenographic

9   notes.

10          I further certify that I am neither attorney or

11  counsel for, nor related to or employed by any of the parties

12  to the action in which this testimony is taken; and

13  furthermore, that I am not a relative or employee of any

14  attorney or counsel employed by the parties hereto or

15  financially interested in the action.

16          IN WITNESS WHEREOF, I have hereunto set my hand and

17  affixed my Notarial Seal this 12th day of August, 2005.

18

19

20

21

22

23                            /S/Donna Hunter

24                            NOTARY IN AND FOR THE STATE OF

25                            WASHINGTON, RESIDING IN SEATTLE