01

02

03

04

05

06

07

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

08 | UNITED STATES OF AMERICA,                )   CASE NO. CR00-186-TSZ
                                              )
09 |         Plaintiff,                        )
                                              )
10 |    v.                                     )   SUMMARY REPORT OF U.S.
                                              )   MAGISTRATE JUDGE AS TO
11 | NORMAN HUGH SMITH,                        )   ALLEGED VIOLATIONS OF
                                              )   SUPERVISED RELEASE
12 |         Defendant.                        )
    _____ )

13

14

## Introduction

An evidentiary hearing on supervised release revocation in this case was scheduled before me to address preliminary matters on June 14, 2005, and for hearing on July 14, August 25, and August 29, 2005.  The United States was represented by AUSA Ilene Miller  and the defendant by Terrence Kellogg.  The proceedings were recorded by a court reporter.

Defendant had been sentenced on or about April 18, 2001 by the Honorable Thomas S. Zilly on two counts of Making and Subscribing a False Individual Tax Return and two counts of Making and Subscribing a False Corporate Tax Return and sentenced to 36 Months Custody, one year Supervised Release.

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -1

01        The conditions of supervised release included requirements that defendant comply with all

02   local, state, and federal laws and with the standard conditions of supervision.  Other special

03   conditions included no firearms, submit to search, restitution in the amount of $7,500.00, provide

04   access to financial information, maintain a single checking account and disclose it to probation

05   officer, provide business records to probation officer for any business interest or enterprise,

06   disclose all assets and liabilities, allow inspection of personal computer, no new credit without

07   authorization, no self-employment or employment by friends, relatives, associates or persons

08   previously known to defendant unless approved by probation officer, obtain probation officer

09   approval for all employment, do not work for cash, provide pay stubs to probation officer, do not

10   possess identification documents in any but true name, furnish personal and corporate financial

11   information records to probation officer and pay all outstanding tax liabilities. (Dkt. 127).

12        In an application dated October 26, 2004,  U.S. Probation Officer Calvin Bouma  alleged

13   the following violation of the conditions of supervised release (Dkt. 139):

14        1.      Filing a false financial statement on or about September 1, 2003, in violation of the

15   special condition requiring him to disclose all assets and liabilities to the U.S. Probation Office.

16        2.      Filing a false financial statement on or about September 15, 2004 in violation of

17   the special condition requiring him to disclose all assets and liabilities to the U.S. Probation Office.

18        3.      Filing a false monthly report for May 2004 in violation of standard condition

19   number 2.

20        4.      Filing a false monthly report for September 2004 in violation of standard condition

21   number 2.

22        5.      Maintaining more than one bank account, in violation of the special condition

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -2

01 requiring him to maintain a single checking account in his name.

02        6.        Failing to pay outstanding tax liabilities once assessed or to enter into an installment

03 agreement payment plan with the Collections Division of the IRS, in violation of the special

04 condition requiring him to do so.

05        Subsequently, the government withdrew alleged violation number 6. (Dkt. 156). A Bill of

06 Particulars was filed on June 28, 2005. (Dkt. 158).

07        Defendant was advised in full as to the remaining charges and as to his constitutional

08 rights, denied the allegations, and requested an evidentiary hearing before a Magistrate Judge.

09        The quantum of proof required to establish a violation of supervised release is by a

10 preponderance of the evidence. *Johnson v. United States*, 529 U.S. 694, 700 (2000).

11 <u>**Case History**</u>

12        Defendant Norman Hugh Smith ("Hugh Smith", also referred to as "Norm Smith") was

13 indicted on April 6, 2000, together with his ex-wife Sophia Alice Smith ("Alice Smith"), on

14 charges relating to a plastics manufacturing business called Precision Laboratory Plastics, Inc.

15 ("PLP").   Hugh Smith and Alice Smith were charged with tax fraud offenses relating to the

16 accounting practices of PLP. (Dkt. 1). In a plea agreement signed on October 22, 2000, Hugh

17 Smith pled guilty to Count 2 of the Indictment, "Making and Subscribing a False U.S. Individual

18 Income Tax Return" for the tax year 1993. In exchange for the plea of guilty, the United States

19 dismissed the remaining charges in the Indictment, and dismissed the charges against Alice Smith.

20 In the plea agreement, defendant Hugh Smith stipulated that he knowingly and intentionally

21 diverted to his own personal use at least $650,000 in payments made to PLP, omitting the

22 payments from the books of PLP.  He admitted that he caused PLP to pay his personal expenses

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -3

01  with corporate funds and to claim those expenses as business expenses, taking a tax deduction on

02  the corporate income tax returns.  He admitted that he filed materially false individual and

03  corporate income tax returns for 1993 and 1994.  (Dkt. 110).

04      Defendant commenced supervision on November 17, 2003.  He was initially supervised

05  by U.S. Probation Officer Gina Martinis, who met with him on November 18, 2003 to review the

06  conditions of supervised release, which they discussed at length.  Mr. Smith questioned the

07  necessity of a number of the conditions.  At the end of the meeting, he acknowledged the

08  conditions in writing.  (Tr. 15-17, hearing of July 14, 2005, Ex. 1).U.S. Probation Officer Calvin

09  Bouma assumed responsibility for supervising Mr. Smith in September 2004 when Ms. Martinis

10  commenced maternity leave.  (Tr. 27-28, hearing of July 14, 2005).

11                  **Allegations Regarding Violation of Supervised Release**

12      The government alleges that Mr. Smith failed to list a bank account at the Viking Bank,

13  failed to list an investment account at American Century Funds and income from that account,

14  failed to list a life insurance policy, failed to list business income from the fishing vessel Alliance,

15  failed to list his credit cards, failed to list a post office box, and failed to list other income.

16      The investigation into the allegations occurred after Mr. Bouma became the defendant's

17  probation officer, shortly before the defendant's anticipated release from supervision. (Tr. 6 -7,

18  hearing of August 25, 2005).  Mr. Bouma was concerned about  discrepancies between the assets

19  reported by Mr. Smith in November 2000 compared to those reported when he commenced

20

21      [1] References to the hearing transcript will appear as "Tr." followed by the page and date
    of the hearing.  References to the exhibits will appear as "Ex." followed by the exhibit number.
22  References to the court file will appear as "Dkt." followed by the docket number.

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -4

01   supervision upon discharge from prison.  Mr. Bouma obtained authorization to search the

02   condominium in which Mr. Smith was residing with his ex-wife Alice Smith, seizing financial

03   records, a computer and computer disks.  (Tr. 46, hearing of July 14, 2005, Ex. 7A-B, 8-12).  A

04   number of these documents were introduced into evidence, including emails, copies of checks, and

05   other documents.  The government contends that documents seized show that financial statements

06   and monthly reports filed by Mr. Smith were false.  The government further contends that the

07   documents show that Mr. Smith maintained more than one bank account, and was therefore in

08   violation of a special condition of supervised release.

09         The monthly reports which are the subject of the evidentiary revocation petition are for the

10   months of May and September 2004 (Ex. 3 and 4).  The pertinent financial reports are December

11   1, 2003[2] (Ex 2A and B) and September 15, 2004 (Ex 4A and B), each report consisting of a net

12   worth statement and a cash inflow/outflow statement.  In the financial statements, Mr. Smith listed

13   a checking account at Washington Mutual Bank, but no other bank accounts.  (Ex. 2A and 4B,

14   Tr. 49-51, hearing of July 14, 2005.)  He indicated that he had no securities, no life insurance,

15   some cash, no anticipated assets, no business holdings, no transfer or sale of assets, no prospective

16   increase in assets, and no debts.  In answering the question about charge accounts and lines of

17   credit, Mr. Smith indicated "This area is a mess–I am investigating and will submit a listing at a

18

19         [2] Although one of the alleged false financial statements is mistakenly referenced as
     "September 1, 2003" in the Petition filed by Mr. Bouma, (Dkt. 139), it was actually the December
20   1, 2003 financial statement that was the subject of  violation number one.  It is clear from the
     hearing transcript that the parties understood that the December 1, 2003 financial statement was
21   at issue. (e.g. Tr. 47, hearing of July 14, 2005; *see also*, Tr. 16-18, hearing of August 29, 2005).
     The pertinent exhibits that were admitted without objection related to the December 1, 2003
22   financial statements. (Tr. 16-18, hearing of August 29, 2005)

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -5

01 later date". (EX 2A, 4A, page 7, Tr. 51, hearing of July 14, 2005). In filling out the monthly cash

02 flow statement, Mr. Smith listed no business income, no allowances, no salary from a spouse or

03 significant other, no other joint spousal income, no income of others living in the household, no

04 other amounts received that month, no credit card payments, and no other amounts paid and not

05 reported.  His monthly reports likewise report small amounts of cash inflows and outflows, and

06 lists one bank account at Washington Mutual (Ex. 3 and 4). The monthly reports indicate that he

07 did not rent or have access to a post office box.  He listed no expenditures over $500.  (Tr. 55,

08 58, hearing of July 14, 2005).

09     During the search of Mr. Smith's residence, bank statements pertaining to a Viking Bank

10 account in his name were found, utilizing a Bothell mail box service.  Checks drawn on the Viking

11 Bank account and bearing Mr. Smith's signature were confiscated during the search of his

12 residence. (Ex. 8A-C, 8E, Tr. 67-71, hearing of July 14, 2005).

13     The probation office also conducted credit checks on Mr. Smith, on November 21, 2003,

14 May 10, 2004, and October 15, 2004. (Tr. 31, 74, hearing of July 14, 2005).  The credit reports

15 showed that Mr. Smith's  credit cards were being used on an on-going basis, which Mr. Bouma

16 felt was contrary to information being submitted in the defendant's  monthly reports and financial

17 statements.  (Ex. 5A-C, Tr. 74-76, hearing of July 14, 2005).  Based on comments made to him

18 by the defendant during the search, Mr. Bouma was also concerned that the defendant was more

19 involved with the fishing vessel that he had previously portrayed.  (Tr. 15, hearing of August 25,

20 2005).

21     Mr. Bouma obtained  records from Viking Bank in investigating the account at that bank.

22 (Ex. 8A-D, 11B-C, 34).  Mr. Bouma was informed by the bank that defendant had also directed

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -6

01    wire transfers out of the account during the time that he was on supervision.  (Tr. 71, hearing of

02    July 14, 2005, Ex. 11B and C).  One of the wire transfers was to an individual named Reginald

03    Macomber.  During the search of the condominium, a copy of an email was found that had been

04    sent from Reginald Macomber to Hugh Smith regarding actions to be taken by Mr. Smith as "the

05    owner of the vessel", (Ex. 11A)  This referred to the F/V Alliance,  a 100-foot fishing vessel that

06    Mr. Smith had financed and contracted for to be built in 1994 for the purpose of offshore albacore

07    fishing.  (Ex. 12A & N).

08         Mr. Bouma also obtained records from American Century Investments, relating to a trust

09    account in the defendant's name that was redeemed in September 2004. (Ex.8).  He obtained

10    records from "The Mail Room", the private mail box service in Bothell where Hugh Smith and

11    Alice Smith shared a mail box. (Ex. 29).

12         Central to a consideration of the alleged violations is the government's contention that Mr.

13    Smith failed to divulge the extent of his involvement with the operation of the fishing vessel

14    Alliance after he commenced supervision (12 H-M,(redacted)), and even while in prison (Ex. 12F).

15    The search of the condominium yielded evidence of inquiries made by the defendant on behalf of

16    the vessel when the boat's captain took the Alliance to Fiji without permission.  Mr. Smith

17    contacted the Coast Guard (Tr. 90, hearing of July 14, 2005), arranged for insurance coverage for

18    the vessel and obtained an estimate for repairs and diesel parts.  (Ex. 12L and M). During this

19    inquiry, Mr. Smith represented himself as the president of Offshore Adventures and the owner of

20    the F/V Alliance. (Ex. 12J).  Mr. Smith sought permission from his probation officer in March

21    2004 to travel to Pago Pago, American Samoa, to deal with the problems with the vessel, also

22    describing himself to his probation officer as president of Off-Shore Adventures, the owner of the

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -7

01 Alliance, (Ex. 33), even though Alice Smith later testified at hearing that she became president of

02 Offshore Adventures in 2003 (Tr. 14, hearing of August 25, 2005, Ex. A-4).

03 **FINDINGS**

04 ***Viking Bank Account***

05 The bank account at Viking Community Bank in Ballard (Ex. 34) is pertinent to each of

06 these alleged violations.  The evidence shows that the defendant and Alice Smith, his ex-wife, set

07 up the account in 2000 to pay expenses related to the fishing vessel Alliance which was owned and

08 operated under the name of Off-Shore Adventures, Inc. In listing his bank accounts for the

09 probation office, the defendant did not list this bank account.  The defendant continued to have

10 signing authority on the account after he was released to supervision, as did Alice Smith.

11 The government contends that the defendant violated the conditions of supervised release

12 by not listing this account as an asset in either his financial statements or his monthly reports.  The

13 government also contends that this violated the special condition of supervised release which

14 limited him to maintaining one bank account.

15 The defendant contends that this was not an account that he was required to list.  Related

16 to this contention is an explanation of his living situation after he was released from prison.  Alice

17 Smith, the defendant's ex-wife,  testified that upon the defendant's release from prison, she gave

18 him a place to stay because she felt sorry for him and because she felt he had gotten a "raw deal",

19 (presumably in his criminal case), and because of his poor health[3]. She buys the food and pays all

20 the living expenses because he has no income. (Tr. 54-55, hearing of August 25, 2005). When Mr.

21 _____

22 [3] The defendant testified that he is in very poor health due to an enlarged heart, congestive
heart failure and diabetes.  (Tr. 61, hearing of August 25, 2005).

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -8

01  Smith went to prison, he gave his ex-wife a power of attorney.  She testified that she became the

02  sole officer of Off-Shore Adventures, and from that time forward managed the Alliance. (Tr. 23,

03  hearing of August 25, 2005). She paid all the expenses of the vessel with either one of her credit

04  cards, one of his credit cards if her limits were not high enough, her personal check, or a check

05  from the Viking Bank account "depending on what the situation was and how much money was

06  in the account." (Tr, 31, August 25, 2005 hearing).  Then she would either pay the credit card

07  bills from the Viking bank account or if there were not sufficient funds in that account, from her

08  personal bank account.  Because the boat wasn't doing well financially, she paid many of the bills

09  herself, so the boat owed her thousands of dollars.

10  Alice Smith also testified that she paid Mr. Smith's tuition at Skagit Valley College from

11  the Viking bank account.  She wanted to motivate him to do something besides stare at the

12  television.  She wrote the check on  the vessel's bank account because she had paid a lot of the

13  vessel expenses and was  owed the money.  (Tr. 35, hearing of August 25, 2005).

14  Because the defendant remained a signer on the checks, Alice Smith occasionally directed

15  him to write checks on the Viking account.  For example, she had him write a check to IFG

16  Insurance Company for a life insurance premium.  She testified that she was the beneficiary on this

17  policy.   (Tr. 36, hearing of August 25, 2005). From time to time, she authorized the defendant

18  to write checks for fishing vessel expenses.  She testified that he was not authorized to write

19  checks for his own personal expenses because it was corporate money.  (Tr. 37, hearing of August

20  25, 2005).

21  Some of the canceled checks offered as exhibits (Ex. 8C, 34) can be seen in a light

22  consistent with Alice Smith's testimony.  For example, check number 9628 written to the order

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -9

01  of Cash for $1,350 signed by Hugh Smith bears a memo that it was for an exhaust manifold and

02  turn bow charger on the boat. (Tr, 74, hearing of August 25, 2005, Ex. 8C)

03       On the other hand, the evidence could also be interpreted as the government suggests–that

04  Mr. Smith was using the Viking Bank account to pay his personal expenses, such as credit card

05  expenses, obtaining cash, and paying his life insurance premium. Particularly disturbing is the fact

06  that whichever interpretation is correct, both the defendant and Alice Smith were disbursing funds

07  from a corporate account to pay non-corporate expenses–similar to the accounting practices that

08  had previously led to tax fraud and indictment in April 2000. The benign interpretation advanced

09  by Alice Smith may be correct, but the casualness with which she and the defendant continued to

10  intermingle their personal and business accounts is certainly cause for concern and would have

11  been an important area for defendant's probation officer to be able to monitor.

12       For reasons that have not been explained, Hugh Smith and Alice Smith decided to retain

13  him on the Viking Bank account as a signer after he was released from prison, even though they

14  contend he no longer had any ownership interest or corporate responsibility for the vessel.  It is

15  undisputed that the defendant failed to list the Viking Bank account, for which he had signing

16  authority, on any of his monthly reports or on his monthly statement.  By failing to do so, he

17  frustrated the ability of his probation officer to evaluate these expenditures and to confirm the

18  defendant's assertion that they were not for personal expenditures.  Considering the defendant's

19  assertion that his ex-wife became the sole decision-maker in Off-Shore Adventures after he went

20  to prison, there was no necessity for him to remain a signer on this account.  He continued to

21  retain signing authority on the account even after he was released from prison, and continued to

22  write checks on the account, whether at her direction as they contend, or on his own initiative.

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -10

01  Compliance with the terms of supervised release required him to have listed the bank account on

02  his monthly report and on his financial statements.

03  ### *American Century Account*

04      Mr. Bouma testified that one of the items that he found upon searching the defendant's

05  residence in October 2004 was an uncashed redemption check written to Hugh Smith in the

06  amount of $5,671.03 from American Century Investments dated September 22, 2004. (Tr. 61,

07  hearing of July 14, 2005, Ex. 7A, 7B). This was not an account that the defendant had listed in

08  any of his financial statements or monthly reports.  Hugh Smith testified that his business set up

09  gift trusts in 1994 with American Century Investments for certain key employees (including

10  himself).  The investments could not be accessed by the beneficiaries until the date of maturity ten

11  years later.  Mr. Smith testified that he had forgotten all about the trust, so he didn't list it as an

12  asset, and did not mention the redemption check because he didn't know that the check had been

13  issued.  (Tr. 81, hearing of August 25, 2005).   Alice Smith testified that she asked for the

14  redemption check to be issued when American Century Investments asked for directions for

15  reinvestment of the trust proceeds upon its maturity.  She completed the forms and returned them,

16  signing the defendant's name because she handled his finances and had his power of attorney. (Ex.

17  7C, Tr. 41-43, hearing of August 25, 2005).  When the check arrived, she set it aside in order to

18  consider whether to reinvest it and did not tell the defendant that it had come in the mail.  (Tr. 45,

19  hearing of August 25, 2005).

20      Defendant argues that the government must show that a false statement was made willfully,

21  deliberately, and with knowledge that it was untrue to support a violation of statutes such as 18

22  U.S.C. §1001 (submitting false statements to a government agency), 18 U.S.C. §1623, (testifying

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -11

01  falsely before the grand jury) or 18 U.S.C. §1621 ( perjury). The government does not cite

02  contrary authority. Applying this standard, the government has not proven by a preponderance of

03  the evidence that the defendant willfully and knowingly failed to list the American Century

04  Investment account or the redemption check on his financial statement or monthly report.

05                                    *Life Insurance Policy*

06          The Net Worth Statement which defendant was required to complete asks him to list life

07  insurance in Section D of the statement.  Requested information includes the name and address

08  of the company and the name of the beneficiary.  The instructions for completing the net worth

09  statement asks for "a complete listing of all assets you own or control as of this date and any

10  assets you have transferred or sold since your arrest."  (Ex. 2A).

11          Both Alice Smith and Hugh Smith testified that the defendant had an insurance policy with

12  ING Insurance which was purchased some years in the past when the Smith's previous business,

13  Precision Laboratory Plastics, took out a SBA loan that required them to obtain on Hugh Smith's

14  life insurance to cover the loan.  (Tr. 36, hearing of August 25, 2005).  Alice Smith stated that she

15  is the beneficiary and that the policy is owned by the Smith Family Trust.  (Ex. A-1).  She testified

16  that some of the payments were made by PLP, some by Off-Shore Adventures, and some by Alice

17  Smith.

18           Alice Smith continued to make the premium payments.  ( *e.g.*, Ex. 8B, page 1, Ex. 35,

19  page1and 4). The insurance company sent the billing statement for the premiums not to the Smith

20  Family Trust or to Off-Shore Adventures, but  to Norman Hugh Smith. (Ex.10.)  The evidence

21  does not establish that anyone other than Norman Hugh Smith owns the policy.

22          On the other hand, as the defendant points out, he had only been home ten days when he

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -12

01  completed the December 1, 2003 financial statement that is the subject of the alleged violation.

02  (Tr. 23, hearing of August 29, 2005).  While the defendant did not list the insurance policy in that

03  net worth statement (Ex. 2, page 3), he did list it in the September 15, 2004 net worth statement.

04  (Ex. 4B, page 2). The only premium payment check signed by the defendant is dated the day

05  before, September 14, 2004, which indicates that his memory may have been refreshed at that time

06  about the existence of the policy. (Ex.8A, page 1).

07         The insurance policy is an asset that should have been listed in the defendant's financial net

08  worth statement, a fact that he apparently recognized in September 15, 2004.  While his failure

09  to have listed the policy in the December 1, 2003 statement may have been a technical violation

10  of the terms of supervised release, I do not recommend that he be found to have committed the

11  violation.  This recommendation is based on the testimony that the policy was obtained some time

12  in the past, that Alice Smith was the beneficiary, that Alice Smith apparently made most of the

13  premium payments, and that the defendant did list it in the more recent net worth statement.

14                          ***F/V Alliance* and *Off-Shore Adventures, Inc*.**

15         The government contends that the defendant violated the terms of supervised release by

16  failing to report business income from the fishing vessel Alliance.  As evidence of this, the

17  government points to payments on the defendant's credit cards and other bills from the vessel's

18  bank account, Viking Bank.  Related to that contention is the government's assertion that the

19  defendant also failed to list his interest in the F/V Alliance.  The defendant argues that the vessel

20  was owned by Off-Shore Adventures, which was owned by the Smith Family Trust, that any bills

21  that were paid from the Viking Bank account were for expenses of the vessel, and that he had no

22  interest in any of those entities or in the bank account.

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -13

01      Alice Smith testified that she used credit cards that belonged to her ex-husband to pay bills

02  for the F/V Alliance because the boat didn't have any credit cards and her own credit card limits

03  were sometimes too low.  She used Mr. Smith's credit cards because she had his power of

04  attorney. (Tr. 31, hearing of August 25, 2005).  When the credit card bills came in, sometimes

05  she paid them out of her account and occasionally she would pay them with the Viking Bank's

06  account.  She testified that Mr. Smith did not write checks on the account to pay his own credit

07  cards, but she made the payments because the money was due for expenses she had charged on

08  the credit cards for the boat. (Tr. 33, hearing of August 25, 2005). However, the defendant's

09  signature appears on some of the checks that appear to be credit card payments ( *e.g.* Ex. 8A,

10  check 9621, Ex. 34, check 9653).  The defendant also had signing powers on the vessel's bank

11  account, which is the subject of previous discussion in this report.  Furthermore, despite his

12  assertion that he had no interest in the vessel, the defendant repeatedly, and under oath,

13  represented himself as the president and owner of the vessel.

14      Much of the evidence relied upon by the government to support its contention that the

15  defendant's involvement with the vessel was greater than he was prepared to acknowledge stems

16  from Hugh Smith's efforts to recover the vessel when its captain took the boat to Fiji without

17  authorization.  Although Alice Smith testified that after she became sole director of Off-Shore

18  adventures when the defendant went to prison (Ex. A-4) and managed 99% of the work managing

19  and overseeing the operations of the fishing vessel, (Tr. 25, hearing of August 25, 2005), the

20  evidence shows that Hugh Smith was heavily involved from November 2003 ( *see*, Ex. 12H)

21  through at least July 2004 (Ex. 12M) in the effort to recover and repair the fishing vessel. (*See*

22  *also*, Ex. 11A-C, 12B, 12I-N, Ex.31).  Indeed, there is no evidence of Alice Smith's involvement

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -14

01  at all in this effort, during which time Hugh Smith repeatedly represented himself, under oath on

02  at least one occasion, to be "the president of Offshore Adventures, Inc.," and "the owner of the

03  F/V Alliance".  (Ex. 12H, *see also* Ex. 31, 33).

04      Hugh Smith was unquestionably involved deeply in the management and operation of Off-

05  Shore Adventures and the fishing vessel before his arrest. (*e.g.*, Ex. 12A, 12C-G, 12N).  Although

06  Off-Shore Adventures has ostensibly been the "owner" of the Alliance since 1994 or 1995 (Tr. 17,

07  hearing of August 25, 2005), and Off-Shore Adventures is ostensibly owned by the Smith Family

08  Trust (Tr. 27-28, hearing of August 25, 2005), Hugh Smith appears to have consistently acted as

09  the actual owner of the vessel.  For example, the NOAA Beacon registration form indicates that

10  Norman H. Smith, not Off-Shore Adventures, is the owner of the Alliance. (Ex. 12B). The earnest

11  money agreement for the unsuccessful sale of the vessel in 1990 lists Hugh Smith, not Off-Shore

12  Adventures, as the owner of the vessel.  (Ex. 12C).

13      Despite the substitution of Alice Smith as sole director of Off-Shore Adventures at the

14  time of the defendant's incarceration, Hugh Smith continued to represent himself as president of

15  Offshore-Adventures, even to the United States Probation Office in requesting permission in

16  March 2004 to travel to Pago Pago in American Samoa to assess damage to the vessel. (Ex. 33).

17  The demonstrated degree of Mr. Smith's involvement with the boat does not support Alice

18  Smith's testimony that she was handling 99% of the management of the vessel and that he was

19  doing "not much at all".  (Tr. 25, hearing of August 25, 2005).

20      Hugh Smith and Alice Smith's testimony to the contrary, the evidence shows that Mr.

21  Smith continued to be actively involved in the management and direction of Off-Shore Adventures

22  and the F/V Alliance.  He signed checks, including reimbursements to his credit card accounts,

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -15

01   arranged for insurance, (Ex. 12L), commenced legal proceedings, (Ex.12K), and made purchases.

02   (Ex. 12M).  At a minimum, the defendant should have listed Off-Shore Adventures and the F/V

03   Alliance on his net worth statements either as an asset, (Ex. 2A and 4B, Section I "Other Assets"),

04   as a trust asset (Section J), or as a business holding (Section K).

05         While the evidence does not show that the defendant realized business income from either

06   Off-Shore Adventures or the F/V Alliance, the evidence does establish that the defendant received

07   other income, as discussed in the following section, which should have been declared.

08                         *Credit Cards*

09         Despite admittedly having a number of credit cards issued to his name, the defendant did

10   not provide his probation officer with a listing of those cards, indicating on December 1, 2003

11   "This area is a mess–I am investigating and will submit a listing at a later date".  (Ex. 2A, page 7).

12   He specifically reported in his monthly cash outflow report that no credit card payments were

13   being made, (Ex. 2A page 3), although regular payments were being made on these credit cards

14   through the Viking Bank account. ( *See also*, Ex. 5A-C, credit summaries, showing regular

15   payments being made on both revolving and installment credit attributable to the defendant). The

16   defendant never provided the listing that he promised in the December 1, 2003 financial statement,

17   (Tr. 51, hearing of August 25, 2005), but his probation officer did obtain the information. During

18   the time that she was supervising him, Ms. Martinis obtained several credit reports that showed

19   the credit cards, the balances, and the payments, and she discussed the information with the

20   defendant. (Tr. 31-32, hearing of July 14, 2005).  Then, on September 15, 2004, in response to

21   the question about credit cards, the defendant answered "See Bankruptcy Filings", which

22   apparently did list the cards.  (Ex. 28). Despite this, the defendant again said that no credit card

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -16

01 payments were being made. (Ex. 4A, page 3). While the defendant did not go so far as to

02 represent that he did not possess any credit cards, he did falsely state that no credit card payments

03 were being made.

### Post Office Box/Mailing Address

05       Since 2002, both Alice Smith and Hugh Smith utilized a mail box service in Bothell called

06 "The Mail Room". (Ex. 29).   Defendant's probation officer talked to the individual who operated

07 The Mail Room, who remembered Mr. Smith and said that he had been coming there "for quite

08 awhile".  (Tr. 56, hearing of July 14, 2005).  The defendant consistently answered "no" when

09 asked on his monthly report forms if he had a "post office box", and never listed any mailing

10 address different than his ex-wife's condominium. (*e.g.*, Ex. 3. *See also* Tr. 26, hearing of August

11 29, 2005). Defendant's explanation for his failure to list the Bothell mail box was that it was not

12 a "post office box" because it was not located at a Post Office.  Rather, the defendant considered

13 the private mailbox in Bothell to be a "permanent address". (Tr. 78, hearing of August 25, 2005).

14 The explanation is disingenuous because the defendant also failed to list the Bothell mail box as

15 a mailing address.  On the numerous occasions that the defendant failed to list this mail box on his

16 monthly report forms, he violated the terms of supervised release.

### Failure to List Other Income and Liabilities

18       The government contends, and the defendant does not disagree, that credit cards issued

19 in the defendant's name were used to pay expenses of the F/V Alliance, and that funds in the

20 vessel's bank account were used to make the credit card payments.  In fact, the defendant wrote

21 some of the checks himself,  (*e.g.,* Ex. 8A), despite Alice Smith's assertions to the contrary. (Tr.

22 33, hearing of August 25, 2005). Since the defendant's credit was encumbered by the charges on

01  the credit cards, he realized a financial benefit by having the charges paid, by whatever source.

02  Both the charges and the payments should have been listed in the cash flow statement.

03        The government points to other specific examples of income which the defendant should

04  have declared.  The government alleges that Alice Smith, the defendant's ex-wife, should be

05  considered a "significant other" whose income should have been declared by the defendant, but

06  it has not been established by a preponderance of the evidence that the relationship between Alice

07  Smith and Hugh Smith could appropriately be characterized in this way.  Defendant's probation

08  officer was well aware that Alice Smith was paying virtually all of her husband's living expenses,

09  (Tr. 21, 34, hearing of July 14, 2005), and in fact conducted a visit to her condominium before the

10  defendant was released from prison to confirm that it was a suitable place for him to reside.

11  (Tr.21, hearing of August 25, 2005).

12        The government contends that a May 28, 2004 uncashed cashier's check in the amount of

13  $230.00 payable to Hugh Smith by Maureen McKitterick should have been listed as income.  Alice

14  Smith testified that the check represented a repayment of a loan she made to Ms. McKitterick for

15  gas money and the check was not cashed because it should have been made payable to her rather

16  than to the defendant.  The fact that the check was held so long without being cashed supports this

17  contention.  The failure to list this check as income does not amount to a violation.

18        The government further points to the approximately five hundred dollars in cash that was

19  on Mr. Smith's person at the time of the search of his condominium, contending that these funds

20  should have been listed as income on Mr. Smith's monthly report.  Mr. Smith testified that his wife

21  had lent him the funds because he had anticipated the need to have cash to pay his attorney, and

22  he returned the funds to his ex-wife when the funds were no longer needed. (Tr. 67, hearing of

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -18

August 25, 2005).  The defendant's probation officer was present at the time of the search, and the source of the funds were explained to him by Mr. Smith at that time.  The failure to list such funds on a subsequent monthly report does not constitute a violation.

Next, the government suggests that Viking Bank account check #9635 signed by Mr. Smith payable to Alice Smith for "loan repayment" (Ex. 34) is evidence of money that had been loaned to the defendant by his ex-wife and which should have been listed in a monthly report. However, while it is hard to understand why Alice Smith didn't simply write the check to herself since she was a co-signer on the account, it has not been shown by a preponderance of the evidence that the "loan" had been made to Mr. Smith, rather than to some other entity or person or for some other purpose.  This transaction does not support a finding of a violation.

Finally, the government points out that the defendant enjoyed income in the form of the payment of his tuition at Skagit Valley College, which was paid by Alice Smith by a check written on the Viking Bank Account on August 13, 2004.  (Ex. 8E). This payment of $850 was certainly a financial benefit that the defendant should have reported in the September 2004 monthly report either as cash inflow/outflow, or as an expenditure over $500, (Ex. 4, page 1), although this does not constitute a major violation in and of itself.[4]

## **CONCLUSIONS**

### *Violations 1 and 2*

The defendant committed the violation of filing a false financial statement on December

---

[4] Ms. Martinis testified that she knew the defendant was attending school and was told that he had received scholarships.  She did not recall if he told her that Alice Smith was paying the tuition.  (Tr. 30-31, hearing of July 14, 2005).

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -19

01 | 1, 2003 and September 15, 2004 in failing to list the bank account at Viking Bank.  He also

02 | committed this violation by reporting that no credit card payments were being made, but this is

03 | mitigated by the fact that his probation officer had full access to information regarding his credit

04 | cards from the credit reports that she obtained, with his knowledge, and from the bankruptcy

05 | filings, which he provided to his probation officer in September 2004.  He also committed the

06 | violation of filing a false financial statement on both dates by failing to list his interest in Off-Shore

07 | Adventures and the F/V Alliance, although this violation is mitigated by the statement which he

08 | provided to his probation officer in March 2004 when he requested permission to travel to Pago

09 | Pago to attend to the boat. (Ex. 33). In this statement he did describe in full his involvement with

10 | the vessel.

11 | *Violations 3 and 4*

12 | The defendant committed the violation of filing a false monthly report for May 2004 and

13 | September 2004 by failing to report his mail box either as a post office box or as an alternative

14 | mailing address, and by failing to list the bank account at Viking Bank.

15 | *Violation 5*

16 | The defendant committed the violation of maintaining more than one bank account by

17 | retaining signing authority on the Viking Bank account and by continuing to write checks on the

18 | account.

19 | I therefore recommend the Court find defendant violated his supervised release as alleged

20 | in Violations 1 through 5 as set forth more specifically above, and that the Court conduct a hearing

21 | limited to the issue of disposition.  The next hearing will be set before Judge Zilly.

22 | Pending a final determination by the Court, defendant continues to be supervised by his

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -20

01   probation officer on the same conditions of his supervised release.

02          DATED this  4th  day of  October , 2005.

03

04                                    Mary Alice Theiler
                                      United States Magistrate Judge

05

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

SUMMARY REPORT OF U.S. MAGISTRATE JUDGE
AS TO ALLEGED VIOLATIONS OF SUPERVISED
RELEASE
PAGE -21